LIFE OF THE LAND, A Hawaii non-profit corporation, Plaintiff-Appellant, *v.* GEORGE R. ARIYOSHI, Governor of the State of Hawaii, et al., Defendants-Appellees.

NO. 6872

APRIL 26, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

*Per Curiam.* Life of the Land (LOL) sought an injunction halting the construction of the Central Maui Water Transmis-

sion System, upon the ground that the environmental impact statement (EIS) is inadequate and unacceptable under the provisions of HRS Chapter 343. LOL asserted that there is insufficient consideration of the primary and secondary impacts of the project (Count I), that there is an inadequate discussion of alternatives (Count II), and that there is not a full examination of the costs and benefits which would accrue (Count III). LOL also charged violations of HRS Chapter 344, the State environmental policy statute (Count IV). LOL appeals from orders granting defendant Ariyoshi's motion for partial summary judgment on Counts I and II, and defendant Wailea's motion to dismiss Count III. An injunction pending appeal was denied by the trial court.[1] This case is now before us on LOL's motion for an injunction halting the construction pending determination of this appeal. For the reasons given below, we decline to grant an injunction pending the appeal.

The Central Maui Water Transmission System is a joint venture between the Board of Water Supply of the County of Maui, Wailea Development Company, and Seibu Real Estate Company, Ltd. The System is to consist of a pipeline beginning in Waiehu in northwest Maui and crossing the central isthmus to Makena in south Maui. The water transmission project will take water being developed from a private source and will provide water to the public in the transmission area. Notices to proceed with the project were issued in the fall of 1977, and work has commenced.

LOL's position is stated as follows in its memorandum in support of the motion:

"It is Appellant's contention that the water scheduled for diversion from Waiehu-Waihee areas of Maui to service the needs of the Appellees in Wailea and Makena is a decision that irrevocably commits one of the last remaining sources of good, clean water to help spawn development in the Makena-Wailea area of Maui. The cost of this

---

[1] After the entry of the order by which the trial court denied the injunction pending appeal, a stipulation was filed dismissing Count IV with prejudice.

diversion is that other established areas of Maui will have to go without. It is neither Appellant's position nor place to say this decision is wrong, but rather to insure that quantification and full disclosure of the costs and secondary impacts of such action will be discussed before such irrevocable commitment is made."

LOL argues that the EIS is inadequate because it lacks a cost-benefit analysis and that this deficiency precludes a reasoned determination by the decision-maker. In dealing with the motion, we must consider the proper test for an injunction pending appeal and then consider whether a sufficient showing has been made of probable inadequacy in the EIS to warrant temporary injunctive relief.

I

A motion for temporary injunctive relief requires determination whether, and if so what, action is appropriate to create or preserve a state of affairs such that the court will be able to render a meaningful decision on the merits. Note, Developments in the Law — Injunctions, 78 Harv. L. Rev. 994 (1965), *Rankin v. Coleman*, 401 F. Supp. 664 (E.D.N.C. 1975); *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). We see no fundamental difference in the considerations which should govern the granting of a temporary injunction at the trial and appellate levels. Rule 62(c), H.R.Civ.P.

In passing upon requests for temporary injunctions in actions seeking to restrain construction of federal projects because of alleged non-compliance with the National Environmental Policy Act (NEPA), 42 U.S.C.A. § 4332 (1970), a three-element test is often applied: (1) Is the plaintiff likely to prevail on the merits? (2) Does the balance of irreparable damage favor the issuance of a temporary injunction? (3) Does the public interest support granting the injunction? See, *e.g., Conservation Council of North Carolina v. Costanzo*, 528 F.2d 250 (4th Cir. 1975); *Alpine Lakes Protection Society v.*

*Schlapfer*, 518 F. 2d 1089 (9th Cir. 1975)[2] Where the tempo-
rary injunction is sought from an appellate court and the
issues on appeal go to the merits of the case, the first element
of the test is necessarily concerned with the plaintiff's likeli-
hood of success on the appeal. But here there has been
disposition by summary judgment (Rule 56 H.R.Civ.P.).
Success on this appeal will not determine the merits of the
case. All that may be determined by this appeal will be
whether there existed genuine issues of material fact which
made the granting of summary judgment inappropriate.
Under these circumstances, the first element of the test for
temporary injunctive relief must be concerned with the
likelihood of success in the further proceedings which would
follow remand. LOL's application to the trial court for an
injunction pending this appeal was not supported by any
evidence in addition to that which was before the court on the
motion for summary judgment. We are confined to the record
before us in determining LOL's entitlement to injunctive
relief pending determination of this appeal.

II

To succeed on the merits in this action, LOL must estab-
lish the inadequacy of the EIS. Although the complaint al-
leged various deficiences in the EIS, LOL has in this court
pointed only to the failure of the EIS to provide a cost-benefit
analysis. LOL contends that "this requirement is not satis-
fied by anything less than quantification of the environmental

---

[2] Some courts have followed a three factor test and others have adopted a four
factor test in which irreparable injury to the plaintiff and to the defendant is
separately considered. *NRDC v. Morton*, 337 F. Supp. 165, 167 (D.D.C. 1971), 337 F.
Supp. 167 (D.D.C. 1971), *motion for summ. reversal denied*, 458 F.2d 827, (D.C. Cir.
1972) *dismissed as moot*, 337 F. Supp. 170, *Minnesota Public Interest Research Group
v. Butz*, 358 F. Supp. 584, 625 (D. Minn. 1973) *aff'd* 498 F.2d 1314 (8th Cir. 1974), 7
Moore's Federal Practice 2d § 62.05. Whether a court adopts a three factor or four
factor test has not resulted in any practical difference. Leshy, Interlocutory Injunc-
tive Relief in Environmental Cases: A Primer for the Practitioner, 6 Ecol. L.Q. 639,
641 (1977). In NEPA cases courts have not departed from the injunctive tests they
employ in other cases. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567,
577 (5th Cir. 1974).

amenities capable of quantification and a reasonable discussion of those that are not." LOL analogizes the Hawaii Environmental Policy Act, HRS Chapter 343, to NEPA and asserts that under NEPA a federal agency must prepare a detailed cost-benefit analysis, which "compares in monetary terms (or where that is not possible, in terms which reflect the detailed quantification of environmental, social and economic values) the relative costs and benefits of the proposed project and the reasonable alternatives thereto."

"Cost-benefit analysis" is a term which is employed in such a variety of senses that its use here tends to be misleading. In "the narrow definition of the economist" it means "the systematic identification and evaluation of the consequences of a project, program, or action and the expression of these consequences in a single unit of measure (in the United States, usually dollars)", and in this sense is said to be rarely used by the federal government in making current environmental decisions. Kasper, Cost-Benefit Analysis in Environmental Decisionmaking, 45 George Washington L. Rev. 1013, 1015 (1977). In a broader sense the term may include any formal procedure for comparing the costs and benefits of alternative policies. Peskin and Seskin, Cost Benefit Analysis and Water Pollution Policy 1 (1975).

Cost-benefit analysis is an analytical technique which affects both the informational content of an EIS and its mode of expression. It has been pointed out that the controversy with respect to cost-benefit analysis has two aspects. Kasper, op. cit. 1022. The first involves the question of which consequences of an action are capable of quantification and how this may be accomplished. The second aspect involves the need for and value of reducing all consequences to single unit measures, a practice that has been characterized as having serious drawbacks.[3] Thus the consequences of a proposed

---

[3] "Frequently, in the analysis of the consequences of alternative policies, there is an attempt to convert all measures of benefits and costs into a single, often monetary, unit. The decision maker is thereby presented with a description of benefits and costs that enables the net effects of an action to be described in a single figure. Expressing effects in a single unit may enhance consistency among decisions by

action might be quantified in terms of number of persons affected, quantities of matter introduced into the air or water, years of continuance and the like. An EIS might be subject to criticism for failing to provide such quantification of effects although, had it done so, a cost-benefit analysis in the economist's sense would not have resulted. On the other hand, the extent or lack of quantification of effects which is attempted in the analysis is clearly not a final test of the adequacy of an EIS to serve its purpose. "But where quantification is difficult or impossible or would only serve to mislead by making uncertain results appear precise (for instance in describing aesthetic effects), an explicit qualitative statement of the consequences of alternatives could prove valuable to the decision maker. . . . That is to say, one need not resolve the debate over how best to set discount rates, or how to place values on apparently intangible effects, in order to provide the decision maker with a clear description of the rate at which various benefits will accrue, or at which costs will accumulate, or with a description of the effects upon aesthetics or health or human life." National Academy of Sciences, Decision Making in the Environmental Protection Agency, 27 (1977).

---

enabling decision makers to place the same value on identical effects in different decisions.

"There are, however, serious drawbacks to expressing all benefits and costs in the same unit. The results of such an exercise are highly dependent upon the way the conversion is carried out and on the values of the monetary equivalents chosen. Even 'reasonable' estimates of the value of life, or health, or beauty can vary enormously. Numerical benefit-cost ratios can carry with them a spurious precision that no disclaimer can dispel. Perhaps more significantly, expressions of benefits and costs in monetary terms assume that it is meaningful to convert lives, health, and other consequences of decisions to dollars, an assumption that many are unwilling to accept."

National Academy of Sciences, Decision Making in the Environmental Protection Agency, 30-31 (1977). Also see A. Wildavsky, Economy and Environment: Rationality and Ritual, 29 Stan. L. Rev. 183 (1976).

III

NEPA directs that all federal agencies shall:

"identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given *appropriate consideration* in decisionmaking along with economic and technical considerations." (emphasis added) (42 U.S.C.A. § 4332 (B)).

The Council on Environmental Quality (CEQ) has interpreted NEPA as requiring:

"A rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, is essential. *Sufficient analysis* of such alternatives and their environmental benefits, costs and risks should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects." CEQ Guidelines 40 C.F.R. § 1500.8(a)(4). (emphasis added).

In *Trout, Unlimited v. Morton,* 509 F.2d 1276 (9th Cir. 1974) it was said:

". . . the appellants insist that the EIS is inadequate because it does not contain a formal and mathematically expressed cost-benefit analysis. We do not believe such an analysis is necessary to enable an EIS to serve the purpose for which it is designed.

"This conclusion rests upon the hard fact that there is sufficient disagreement about how environmental amenities should be valued to permit any value so assigned to be challenged on the grounds of its subjectivity. It follows that in most, if not all, projects the ultimate decision to proceed with the projects, whether made by

Congress or an agency, is not strictly a mathematical determination. Public affairs defy the control that precise quantification of its issues would impose.'' 509 F.2d at 1286.

To the same effect also see *Cady v. Morton,* 527 F.2d 786 (9th Cir. 1975); *Sierra Club v. Morton,* 510 F.2d 813 (5th Cir. 1975); *Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir. 1974); *Robinson v. Knebel,* 550 F.2d 422 (8th Cir. 1977).

What LOL characterizes as the ''best logic of what is required under Federal law'' is found in *State v. Corps of Engineers,* 411 F. Supp. 1261 (N.D. Ala. 1976):

Recognizing that NEPA does not demand that every federal decision be verified by the reduction of environmental amenities to mathematical absolutes for insertion into a precise formula, *Sierra Club v. Lynn,* 501 F.2d 43 (5th Cir. 1974), this court nonetheless is of the opinion that where it is reasonably possible to quantify environmental amenities, NEPA requires not only that such amenities be quantified but that they be included in the cost/benefit analysis. *State, supra* at 1268.

HRS § 343-1(6) defines an EIS as ''an informational document . . . which discloses the environmental effects of a proposed action, effects of a proposed action on the economic and social welfare of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effect, and alternatives to the action and their environmental effects''. The implementing regulations of the Environmental Quality Commission (EQC) require that the analysis of all reasonable alternative actions be *''sufficiently detailed to allow the comparative evaluation* of the environmental benefits, costs and risks of the proposed action and each reasonable alternative.'' EQC Reg. 1:42(g) (emphasis added).

While the Hawaii statute, by particularizing the subjects of inquiry, calls for a broader range of information than NEPA, it does not expressly mandate a cost-benefit analysis or quantification in monetary terms. The EQC Regulations

implicitly recognize that inclusion in an EIS of a cost-benefit analysis is discretionary and merely prescribe that when cost-benefit analyses or summaries thereof are included in the EIS, they "should clearly indicate the extent to which environmental costs have not been reflected in such analyses". EQC Reg. 1:42(k).

IV

Even if we were to accept as applicable under Hawaii law the formulation of the NEPA requirement expressed in *State v. Corps of Engineers, supra,* we would still be left with the task of determining what effects of the proposed action are "reasonably possible" to quantify in the EIS. The test must be applied, under HRS § 343-1(6), not only to the environmental effects of the proposed action, but also to its effects on the economic and social welfare of the community and state, the effects of the economic activities arising out of the proposed action and the environmental effects of alternatives to the action. LOL has not pointed out to us which of the effects of the Central Maui Water Transmission System were reasonably possible to quantify in the EIS but were not so treated. Our examination of the EIS has not disclosed where a dollar amount or other unit of measurement might have been used to quantify any of the effects of the project.

The standard of review which should govern a court's determination whether an EIS contains sufficient information to satisfy statutory requirements has been stated:

"In making such a determination a court is governed by the 'rule of reason,' under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a

reasoned choice between alternatives." *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied*, 98 S.Ct. 1238 (1978).

Omissions in an EIS may be so glaring that they create inadequacies which are apparent on the face of the statement. LOL asserts that the omission of cost-benefit analysis of the effects of transferring a resource from one section of Maui to another, thus stimulating development in one area and restraining it in another, is of that character.[4] But for us to pass on the merits of this contention would require an expertise in economics and demography which we do not possess. Whether what is demanded is within the limits of feasibility would seem to be a question which a court may not properly approach without the aid of expert testimony in a properly conducted factual inquiry. The administrative action which is under review here involves a negative determination of that issue. We must be given some reason, supported by the record, to enable us to disagree with that determination. *Cf. Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc.*, 98 S.Ct. 1197 (1978).

On the record before us, we are unable to conclude that a prima facie case has been made in support of LOL's position on the merits of this case, much less a showing of substantial likelihood of success. Since LOL has failed to satisfy the first element of the test for temporary injunctive relief, we do not reach the other elements. We recognize that the weight to be

---

[4] The project distributes throughout central Maui water which originates in the vicinity of Wailuku. Economic and demographic effects are estimated in the EIS for the project area, but without precise breakdown between the parts of the project area which lie at varying distances from the water source. The EIS does, however, predict that most growth will occur toward the extremity of the water distribution system. The feasibility and effects of alternative transmission of the water to other parts of the island, or confining its distribution to the Wailuku area, are not explored. In its complaint, LOL charged that the EIS inadequately discussed primary and secondary impacts of, and alternatives for, the proposed action as well as failing to provide a cost-benefit analysis. In this court, LOL has not specified the primary and secondary impacts which should have been discussed but has directed its argument to an alleged general deficiency in cost-benefit analysis.

attached to the various elements of the test may vary, and that a strong showing of irreparable harm may reduce the weight given to any lack of likelihood of success on the merits. Note, Injunctions, *supra,* 78 Harv. L. Rev. at 1056. Nevertheless, a minimal showing of entitlement to permanent relief is a prerequisite to our consideration and weighing of the other tests of temporary relief. LOL asserts that the interests it represents may be irreparably injured, pending resolution of this appeal, by the irretrievable expenditure of public funds and by the irreversible progress of the project toward completion. Our judicial function would require us to weigh these considerations, and the public interest in the outcome of this case, if LOL had shown some probability of success on the merits in this action. LOL's present challenge, however, is so minimally supported by the record that for this court to grant the requested temporary injunction upon its appraisal of the threat of irreparable harm and the thrust of the public interest would substitute a policy judgment by the court for that of the executive branch.

"[T]he court does not have the function of determining what should be done, or the latitude to substitute its appraisals and conclusions for those of the executive branch. The function of the court, even on the merits, is to consider whether there is a showing that proposed executive action is contrary to law or an abuse of discretion. And for the purposes of considering whether there should be relief pending determination on the merits, the judicial function is even more narrow." *Society for Animal Rights, Inc. v. Schlesinger,* 512 F.2d 915, 918 (D.C. Cir. 1975).

The motion for injunction pending appeal is denied.

*John F. Schweigert* and *E. Cooper Brown* for the motion.
*Ronald Y. Amemiya,* Attorney General, and *Laurence K. Lau,* Deputy Attorney General, for Appellee *George R. Ariyoshi, Governor.*
*Paul R. Mancini,* Corporation Counsel, and *David Nakamura,* Deputy Corporation Counsel, for Appellee Board of Water Supply, County of Maui.

*Shackley F. Raffetto (Mukai Ichiki Raffetto & MacMillan* of counsel) for Appellee *Seibu Fudosan K.K.*

*Francis M. Izumi and Tamotsu Tanaka (Izumi & Tanaka* of counsel) for Appellee Wailea Development Co.