LIFE OF THE LAND, INC., a Hawaii non-profit corporation by itself and on behalf of its members, et al., Plaintiffs-Appellants, *v.* CITY COUNCIL OF THE CITY AND COUNTY OF HONOLULU, et al., Defendants-Appellees

NO. 7240

FEBRUARY 28, 1979

RICHARDSON, C.J., OGATA, MENOR AND KIDWELL, JJ., AND RETIRED JUSTICE KOBAYASHI ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY MENOR, J.

The plaintiffs-appellants have petitioned this court for a temporary injunction pending appeal, seeking to halt all proceedings, including all affirmative actions on the part of the appellee-developers (The Victoria Partnership and The Admiral Thomas Venture) to proceed with the construction of the Admiral Thomas condominium project, in the Kakaako development area, for which a building permit has been issued by the city. In their suit they question the validity of the permit. The appellee-developers, in whose favor summary judgment had been entered by the circuit court, oppose the petition. The First United Methodist Church, intervening defendant-appellee, also opposes the petition. They allege substantial injury to themselves in the event the petition is granted.

The only question before this court, at this stage of the appeal, is whether the motion for temporary injunction should be granted. In order for an appellant to obtain an injunction pending appeal, there must be a showing that he is threatened with irreparable injury and that there is substantial likelihood that he will prevail on the merits of his appeal. *MDG Supply v. Ellis*, 51 Haw. 480, 482, 463 P.2d 530, 532 (1969); *Life of the Land v. Ariyoshi*, 59 Haw. 156, 577 P.2d 1116 (1978). Applying the criteria established by this court to the record in its present state, we are constrained to deny the plaintiffs-appellants motion for a temporary injunction pending appeal.

Because the merits of the controversy are still to be fully heard, we will not in this opinion engage in a detailed exposition of the law and the facts that may be relevant to the ultimate determination of the issues before this court. The briefs of the parties have yet to be filed, and the parties,

thereafter, have yet to be given the opportunity to present oral argument on the merits of the appeal.

We will, however, outline some of the basic facts. Ordinance No. 4551, which established a moratorium on the issuance of building permits in the Kakaako district, became effective on January 23, 1976. While this interim development control was in effect, the appellee-developers on July 11, 1977, made application with the city council for exemption from the moratorium, pursuant to Section IV of the ordinance which permitted the council, in its discretion, to grant relief from the operation of the ordinance. Such an application, in and of itself, was not unusual for, as the record shows, other applications for exemptions had been made and approved by the city council during this interim period. What set this particular application apart from the others was the nature of the proposed construction and the strong opposition voiced against the project.

After taking into consideration the concerns expressed by those in opposition, the city council on September 21, 1977, approved the developers' application for the construction of a 350-foot, 35-story, 177-unit apartment structure. At the time of council approval, the proposed building project was clearly a permitted use of the property under the then operative provisions of Ordinance No. 3234, which had designated the area as an A-4 high density apartment zone. Ordinance No. 4551 did not purport to alter in any manner the underlying zoning districts, general plan, development plan or detailed land use maps applicable to the land under review. The processing of building permit applications on file with the city building department before the effective date of the ordinance was not proscribed. The ordinance simply prohibited the acceptance of building permit applications that would otherwise have been proper in the designated zoning districts.

Subsequent to its approval of the developers' application, the city council on November 10, 1977, determined that several other conditions ought to be imposed. As of that date, approximately $85,000 had already been incurred by the developers for planning and design consistent with the con-

struction specifications initially approved by the city council. The new conditions limited the construction to a building of an average height of not more than 299 feet, with a reduced density of approximately 150 units, and required a set-back from Victoria Street of not less than 95 feet.

The developers were willing to comply. When the necessary plans were completed on January 24, 1978, an application for a building permit was submitted to the city building department. The application included plans, drawings and specifications designed to meet the conditions imposed by the city council. On February 22, 1978, the Thomas Square Historic Cultural and Scenic ("HCS") District Ordinance (Ordinance No. 78-18) became effective. On May 2, 1978, the plaintiffs-appellants filed suit. Presumably because of the pending litigation, the city council withheld final action on the application. Meanwhile, the city's department of utilization, at the request of the city council, continued to monitor the developers' construction plans and designs for conformance with the conditions established by the city council. After the circuit court ruled in favor of the defendants-appellees, the city council on October 25, 1978, determined that all of the conditions it had imposed had been met, and this left the building department free to issue the building permit.

In *Denning v. County of Maui*, 52 Haw. 653, 485 P.2d 1048 (1971), this court instructed the trial court to the effect that if the developer, in good faith reliance upon existing law, had expended substantial sums for the preparation of plans and documents for the purpose of applying for a building permit, and it was further shown that he had been given assurances of some form by county officials charged with administering the law that his proposed construction met zoning requirements, and he had a right to rely on such assurances, the county would be equitably estopped from denying him a building permit by reason of a subsequently enacted prohibitory ordinance. In a principal supporting footnote case cited by this court in *Denning*, the Illinois supreme court said:

> "[P]laintiff's substantial change in position by expenditures in reliance upon the *probability* of the issuance of a building permit, based upon the existing zoning ordi-

nance *and the assurances of city officials,* entitles it to the issuance of a building permit." *Cos Corporation v. City of Evanston*, 27 Ill.2d 570, 576, 190 N.E.2d 364, 367-8 (1963). (Emphasis added)

We reaffirmed the viability in this jurisdiction of this doctrine of equitable estoppel in *Allen v. City & County*, 58 Haw. 432, 571 P.2d 328 (1977), where we said that "if the facts establish that the doctrine of equitable estoppel should apply to prevent the City from enforcing newly enacted prohibitive zoning, then the property owner is entitled to continue construction." 58 Haw. at 439, 571 P.2d at 331. The developers in both *Denning* and *Allen* claim that they, in good faith reliance upon existing law, had expended substantial sums for architectural, engineering and other services necessary to obtain a building permit.

In this case, the expenditures made by the developers were substantial. In reliance upon Section IV of Ordinance No. 4551, they proceeded to file an application for an exemption from the moratorium on July 11, 1977. The record is not clear exactly how much was spent by the developers in the preparation of plans and designs in support of their application, but it does show that up to September 21, 1977, when the city council gave its express approval to the proposed construction, they had already incurred expenditures in excess of $150,000 for planning and design. They first acquired development rights to the property on August 22, 1975, before the passage of Ordinance No. 4551. Following council approval, and between September 21, 1977 and November 10, 1977, they incurred expenditures of close to $95,000 for the project, of which the sum of approximately $85,000 was allocated for planning and design. Subsequent city council action on November 10, 1977, necessitated further construction design modifications. Between that date and April 20, 1978, the developers incurred expenditures of approximately $321,000, of which some $275,000 went for planning and design. By the time suit was filed on May 2, 1978, in an attempt to put a halt to the project, they had incurred further expenditures of approximately $7,500 for planning and design. These expenditures for planning and design were incurred by reason of,

and in compliance with, council action on their application, and in reliance upon the implicit assurance that if the special construction conditions imposed by the council were met, a building permit would issue.

Under these circumstances, the petition for injunction pending appeal will be denied.

*Fred Paul Benco* for plaintiffs-appellants for the motion.
*Joseph T. Kiefer* for defendants-appellees.

### DISSENTING OPINION OF KIDWELL, J.

I do not concur in the present denial of appellants' motion for injunctive relief pending this appeal. Although we have not had the benefit of briefs upon the issues presented by the appeal, the circumstances placed before us by the motion papers convince me that appellants have satisfied the first element of the test for a temporary injunction which we laid down in *Life of the Land v. Ariyoshi*, 59 Haw. 156, 577 P.2d 1116 (1978). Further proceedings would be required to determine how a temporary injunction might be framed in light of the showing that has been made. The remaining elements of the *Ariyoshi* test would require consideration in those proceedings. My view is that denial of the motion at this stage of the matter is not a proper disposition, although what is before us is not sufficient to enable an injunction to be framed which deals adequately with the remaining elements. Because of my belief that this matter presents a substantial threat of irreparable harm to the public interest, I feel that it is necessary to state my reasons for disagreement with the decision which the court has reached.

The action was brought against members of the council of the City and County of Honolulu (the Council) and certain city officers to declare invalid actions of the Council which purported to authorize the issuance of a building permit to appellees. Numerous grounds of invalidity of the Council's actions were alleged, of which the only one which need be mentioned here was that the building would be of a height in excess of that permitted by Ordinance No. 78-18 (HCS Ordinance). Appellees were not named as parties in the complaint and

were permitted to intervene as defendants. Summary judgment was entered dismissing the complaint on appellee's motion. After this appeal was taken from the summary judgment, the building permit was issued. Appellants now seek from this court an injunction against construction of the building purportedly authorized by the building permit. Our jurisdiction to issue such an injunction is founded on HRS § 602-5(6).[1]

In *Life of the Land v. Ariyoshi, supra,* we applied a three-element test in determining whether a temporary injunction should be issued to restrain construction which was alleged to be in violation of law. The elements of that test are: (1) Is the plaintiff likely to prevail on the merits? (2) Does the balance of irreparable damage favor the issuance of a temporary injunction? (3) Does the public interest support granting the injunction? In applying that test here we are faced with one of the difficulties which we met in *Ariyoshi.* This appeal is from a dismissal of the complaint by summary judgment. As in *Ariyoshi,* success on the appeal will not determine the merits of the case, but only whether there existed genuine issues of material fact which made the granting of summary judgment inappropriate. We must look beyond the issues presented by the appeal, to those which will be before the circuit court on remand of the case in the event the appeal is successful, to determine whether appellants have satisfied the test for a temporary injunction. In *Ariyoshi,* plaintiff failed to satisfy the first element of the test. To determine whether that element is satisfied here it is necessary to identify the facts which appellants are likely to establish in the trial of this action and the law which is likely to be applied to those facts.

The record presents a history of legislative action by the Council and of responding action by appellees. There is no

---

[1] §602-5 *Jurisdiction and powers.* The supreme court shall have jurisdiction and powers as follows:

. . . .

(6) To make or issue any order or writ necessary or appropriate in aid of its appellate or original jurisdiction, and in such case any justice may issue a writ or an order to show cause returnable before the supreme court;

. . . .

dispute as to the actions of the Council reflected in its official records. I accept for the purposes of this analysis appellants' version of their responding action. There follows a summary of what I consider the essential facts upon which our decision should turn.

I.

The parcel of land involved is situated in a part of Honolulu which was in 1975 classified as A-4 in the Comprehensive Zoning Code of the City and County, and thus permitted to be developed by construction of multi-family apartment structures like that involved here, subject to various density and other limitations which it is not necessary to state here. The parcel is owned by appellee First Methodist Church. Appellees The Victoria Partnership and the Admiral Thomas Venture (herein the Developers) entered into a long-term lease of the parcel for the purpose of erecting a condominium apartment building (the Admiral Thomas project, or the project). Prior to the filing of an application for a building permit by the Developers, the Council passed Ordinance No. 4551 (the IDC Ordinance) which was approved by the mayor of the City and County and became effective January 23, 1976. This ordinance has remained in effect during all of the times relevant to this case. The IDC Ordinance recited that the Council was in the process of formulating development policies and plans for the area in which the Admiral Thomas parcel lies, which might include the establishment and creation of a special design district, and that the ordinance was adopted to provide an interim development control pending the enactment by the Council of legislation implementing such policies and plans. The ordinance provided that "no applications for building permits shall be accepted" within zoning districts which included the site of the Admiral Thomas parcel, subject to exceptions which are not relevant here and subject to a procedure for obtaining from the Council exceptions from the prohibition placed by the ordinance upon the acceptance of the building permits. This procedure was set forth in Section IV of the IDC Ordinance, entitled "Appeal Provisions",

which is quoted in the margin.[2]

On September 21, 1977, the Council approved an application[3] submitted in behalf of the Developers, pursuant to the appeals procedure of the IDC Ordinance, which proposed the construction of a 350 foot, 35 story, 177 unit apartment structure on the Admiral Thomas parcel. The approval was subject to substitution of "nonreflective and unobtrusive tinted glass, color and texture for the exterior finish of the building", with the stated intent "to make the building as much as possible visually unobtrusive as seen from the Academy of Arts courtyard as well as from other highly developed and heavily travelled areas of Oahu"; and was also subject to approval by the Director of Land Utilization, prior to issuance of the building permit, of size, spacing, type and identification of the proposed plant material and trees, and samples and specifications of exterior colors, textures and finishes. A further condition was stated that all approved landscaping and planting requirements be completed prior to the issuance of a certificate of occupancy for the completed structure.

On November 10, 1977 the Council amended the approval granted on September 21, 1977 so as to confine the building to

---

[2] SECTION IV. Appeal Provisions

A. The City Council shall have the power to vary or modify the application of any provision of this ordinance upon its determination in its legislative discretion, that such variance or modification is consistent with the spirit of the amendments to the General Plan, Detailed Land Use Map, Development Plan and Comprehensive Zoning Code upon which this ordinance is based and with the health, safety, morals and general welfare of the City and County of Honolulu.

B. Applications for such variance or modification shall be accompanied by support data and justification report and shall be filed with the City Clerk who shall refer such application to the appropriate department for a report and recommendation of said department with respect to the effect of the prospective variance or modification upon the proposed amendments to the General Plan, Detailed Land Use Map, Development Plan, and Comprehensive Zoning Code.

The City Clerk, to expedite appeal, shall forward applications for relief within 2 working days after receipt of same in her office, to the appropriate department for its recommendation and report. Such report shall be forwarded by the department to the City Council within thirty days of such reference and shall be placed upon the next agenda of the City Council.

[3] In support of this application the Developers filed plans and elevations which apparently defined with some precision the configuration of the proposed structure, but which are not in the record.

an average height of not more than 299 feet, a density of approximately 150 units and a setback from Victoria Street of not less than 95 feet. By a resolution adopted on the same date, the substantive portion of which is set forth in the margin,[4] the Developers were "respectfully directed" to work toward alterations in the design of the project. The record of the Council meeting at which these actions were taken shows that the resolution was adopted immediately prior to the Council action amending its approval of September 21, 1977, and that adoption of the resolution was preceded by the following statement to the members of the Council by its chairman:

> I just like to make one last comment that you pay very special attention to the third, #3 paragraph. Dan Clement's committee has been working and he has pledged to work as fast as possible to bring to us an HCS District proposal for Thomas Square which I hope will involve

---

[4] BE IT RESOLVED by the Council of the City and County of Honolulu that the land owner, First Methodist Church, and developers Sheridan Ing and Bruce Stark be, and they are, hereby respectfully directed to work with the Academy of Arts and other affected parties to effectuate the following options under conditions as set forth hereinbelow:

1. *Consolidated Development*, hereinafter referred to as the *Preferred Option* shall involve the use of land adjacent to the Admiral Thomas project site at Kinau and Victoria Streets, re-siting the project building further away from Victoria Street. The provision of parking for the Academy of Arts closer to Victoria Street and possibly underground shall be the subject of mutual negotiation between the Academy, the First Methodist Church, and developers Ing and Stark. Conditioned on the availability of funds, the City and County of Honolulu shall undertake the condemnation of adjoining land parcels with the view of providing a site for the Honolulu Theater for Youth, a function presently under the administrative control of the City and County of Honolulu.

2. Consolidation and use of all available parcels shall permit the study and selection of an alternative in which two residential buildings rather than one may be constructed either at one site or at separate locations.

3. Any urban design policy which may emerge for the Thomas Square area shall be considered in the design of the project if this may be done without loss to the interested parties.

4. An additional alternative shall be that compromise which emerged as a result of discussions between the Academy of Arts, the First Methodist Church, and the developers Ing and Stark in late 1974 and early 1975, and which was described in communications with the Mayor and Council and which is further described in the attached editorial of the Honolulu Advertiser dated March 7, 1975.

protection of the Art Academy, protection of Thomas Square and protection of the makai-mauka view corridor during, through that area. And I read this resolution that leaves that option very much open.

From some date prior to September 2, 1977, the Developers were aware that a draft of an ordinance creating a "historic, cultural and scenic district" which would include the Admiral Thomas parcel was under consideration by a committee of the Council and that the draft ordinance contemplated height restrictions which were inconsistent with the Developers' plans. The Developers had, prior to September 21, 1977, presented arguments directly to a member of the Council in an attempt to defeat that ordinance. A public hearing on the proposed ordinance was scheduled to be held on January 25, 1978. On January 24, 1978 the Developers filed an application for a building permit. The proposed ordinance became effective as the HCS Ordinance by its passage by the Council and its approval by the mayor on February 22, 1978. The HCS Ordinance by its terms prohibits construction on the Admiral Thomas parcel of any structure in excess of a height limit computed by a formula. It is not disputed that the building proposed to be constructed by the Developers would exceed that height limit. No exception is made in the ordinance for previously filed building permit applications. There is no provision in the ordinance for granting an exception or variance which would relieve the proposed building on the Admiral Thomas parcel from the height limitation.

On March 29, 1978 the deputy corporation counsel provided a legal opinion to Councilman Kekoa Kaapu in the form of a memorandum which recited that it was furnished in response to the councilman's request of February 3, 1978 and was for the purpose of reducing to writing an oral opinion given to the Council on January 11, 1978, to the effect that the provisions of the HCS Ordinance would not apply to the Admiral Thomas project. In this memorandum, the deputy corporation counsel expressed his opinion that the HCS Ordinance does not apply to the Admiral Thomas project because there is no express or implied retrospective language in

the ordinance and also because the City and County is estopped from applying the HCS Ordinance to a building which complies with the conditions as to configuration and design set forth in the approvals by the Council under the IDC Ordinance on September 21, 1977 and November 10, 1977. The memorandum contained the following as a footnote:

[2] The Director of Land Utilization has been informed that the Council has reserved jurisdiction over the Thomas Project and will not approve the issuance of a building permit on his own volition based on a Committee of the Whole Report which was issued by the Clerk without the Council's condition reserving jurisdiction over the Thomas Project, but will return the application to the Council for a final review as to whether the "conditions" have been met.

I have not been able to discover from the record the extent to which the plans for the project which had been submitted by the Developers before enactment of the HCS Ordinance complied with the conditions laid down by the Council in its action on November 10, 1977. However, the Acting Director of Land Utilization informed the Council on April 10, 1978 that the plans were not in compliance with these conditions in three respects: its average height exceeded 299 feet; the exterior colors and finishes would not satisfy the intent of making the building unobtrusive; and the landscape proposal would not be compatible with the existing landscape character of the Academy of Arts and Thomas Square. On June 16, 1978 the Acting Director of Land Utilization reported to the Council that the plans had been revised and complied with the conditions stated on November 10, 1977, with the exception of the color specified for some of the exterior glass and two projecting elements located on the upper floors of the building. With respect to the critical question of building height, this report adopts the CZC definition of building height as measured only to roof elevation, exclusive of the building parapet, and acknowledges that, as so measured, the building height complied with the height limitation at the time

of the April 10, 1978 report.[5] However, the report pointed out that the building continued to exceed the height limit of 299 feet with the parapet included.

No action with respect to the application was taken by the Council until after the entry of summary judgment dismissing appellants' complaint. On October 25, 1978 the Council adopted a committee report which recommended "favorable action" on the Admiral Thomas project to enable the building permit to be issued. The building permit has been issued and construction is proceeding.

## II.

Only a passing question has been raised with respect to the standing of appellants to seek injunctive relief to restrain the illegal construction of a building of the nature of that which the Developers propose. Such standing is confirmed by our decisions. *Waianae Model Neighborhood Area Ass'n, Inc. v. City and County,* 55 Haw. 40, 514 P.2d 861 (1973).

The proposed construction is clearly in violation of the HCS Ordinance and the burden is upon the Developers to establish their entitlement to proceed in disregard of the terms of that ordinance. It is not contended that the action of the Council on October 25, 1978 constituted an amendment of the HCS Ordinance or the granting of a permitted exemption or variance. The Developers rely upon two theories. The first, upon which the circuit court relied in granting summary judgment, is that the HCS Ordinance should be construed as inapplicable to the Admiral Thomas project as a matter of legislative intent. The second is that the actions of the Developers in reliance upon the approvals of the project by the Council estopped the City and County from denying issuance of the building permit and from interfering with the construc-

---

[5] The assumption of the Acting Director of Land Utilization in his April 10, 1978 report, that the height limit expressed by the Council on November 10, 1977 included the building parapet, appears to be supported by the HCS Ordinance, in which the Council directed that permitted maximum heights of buildings "shall be measured vertically from the existing ground elevation *at all points* of the building or structure." (HCS Ordinance § 5A1, emphasis added.)

tion, and that the construction is therefore not prohibited by the HCS Ordinance.[6]

### A.

The circuit court's decision disposes of the HCS Ordinance in few words. It is said that "legislation will be applied retroactively only if an intent to give retroactive effect is clear" and "in the present case no such intent is apparent." Viewed in isolation from any claim of estoppel by reason of reliance by the Developers upon Council actions, this rationale is clearly unsound.

In *Denning v. County of Maui*, 52 Haw. 653, 485 P.2d 1048 (1971), the County enacted successive ordinances establishing height limits of six stories and two stories respectively. The landowner had submitted for approval plans for a six-story structure which conformed to the first ordinance, prior to enactment of the second ordinance. The second ordinance, as is the case with the HCS Ordinance, was silent as to whether it affected a development in progress. The circuit court ordered the county officials to disregard the second ordinance if the landowner had expended substantial sums for the preparation of plans and documents in good faith reliance upon the prior law and upon a reasonable probability that a building permit would be issued. Upon appeal, we left no doubt that the second ordinance was effective as to landowners identified by this test, although no intent to forestall such developments was expressed in the ordinance. In reversing and remanding the case, we directed the circuit court to confine its consideration to the question of equitable estoppel.

In the present case, the circuit court fell into the same error for which we reversed in *Denning*. Rules of statutory construction do not permit a court to read into legislation which changes zoning standards an unexpressed intent to

---

[6] A substantial issue may remain with respect to the validity of the exception purportedly granted by the Council from the restraints of the IDC Ordinance, to which most of the argument before us has been directed. That issue is reached only if the Developers are free from the restraints of the HCS Ordinance.

leave proposed construction unaffected. The HCS Ordinance is unambiguous. It expressly was effective on enactment, with no exception for the Admiral Thomas project. There was no occasion for the Council to express its intent more clearly in order for the ordinance to be effective in accordance with its terms.

The circumstances of the enactment of the HCS Ordinance do not evidence an intent on the part of the Council to exclude the Admiral Thomas project from the coverage of the ordinance. The legislative record suggests a purpose on the part of the Council, at the time of its November 10, 1977 action, to retain an option to apply the height limitations of any future historical, cultural and scenic district to the project with which they were then dealing. Prior to enactment of the HCS Ordinance the Council was advised that the Developers possessed the benefit of equitable estoppel and that, in the opinion of the deputy corporation counsel, the HCS Ordinance would not apply to them although by its terms it would otherwise do so. To the extent that we can consider any evidence of legislative intent in the face of the unambiguous language of the HCS Ordinance, these circumstances suggest to me an intent on the part of the Council to extend the legislation as broadly as its power permitted, leaving to the Developers the benefits of any equitable estoppel to which the situation entitled them.[7] The Council's subsequent action on October 25, 1978 merely reflects acceptance by the Council of the authority of its legal advisor's conclusion that the Developers continued to be subject to the IDC Ordinance and not to the HCS Ordinance. That, of course, is the question which we must determine in light of the circumstances under

---

[7] We do not know in what terms the oral opinion of the Deputy Corporation Counsel was expressed to the members of the Council. The memorandum by which the oral opinion was confirmed advises that Hawaii is among the states in which a newly enacted zoning regulation applies to proposed construction for which a building permit has not been issued, in the absence of "zoning estoppel." The opinion is expressed that the facts entitle the Developers to the benefit of estoppel. If we assume that the Council was in possession of this legal opinion when it enacted the HCS Ordinance, it seems quite deliberately to have decided to word the ordinance so as to apply to the Admiral Thomas project and leave to legal authority the question whether the estoppel doctrine protected the project.

which the HCS Ordinance was enacted. I find nothing which supports the assumption of intent on which the circuit court proceeded, and certainly nothing which enabled the circuit court to give effect to that assumption in its interpretation of the ordinance.

B.

The second arm of the Developers' argument has more substance. In order to deal with their contention that the actions of the Council, and the Developers' reliance, estops the City and County from enforcing the HCS Ordinance against them, it is necessary to arrive at a formulation of the doctrine upon which the Developers rely.

The question with which we are dealing is one of legislative power. It is not for the courts to frustrate a legislative decision because of a difference in views as to policy and as to the appropriate balancing of public and private interests. As we said in *Denning:*

Mere good faith expectancy that a permit will issue does not create in a property owner a right to continue proposed construction.

52 Haw. at 659, 485 P.2d at 1051. Thus the existing pattern of land use regulation, although it may create values which are reflected in real estate transactions and encourage investments in expectation of continuance of the current allocation of land uses, is subject to revision upon a change in legislative opinion. Constitutional limitations upon legislative freedom to change permitted land uses come into play when a landowner's expectation has ripened into a constitutionally protected right.

It is the general rule that a newly enacted zoning regulation which makes the proposed construction unlawful applies to projects which are in the planning stage, even though the planned project is lawful under the pre-existing law and a building permit has been applied for. Annotation, Retroactive effect of zoning regulation, in absence of saving clause, on pending application for a building permit. 50 A.L.R. 3d 596 (1973). In *Avco Community Developers, Inc. v. South Coast*

*Regional Commission,* 553 P.2d 546 (Cal. 1976), it was said that:

> [N]either the existence of a particular zoning nor work undertaken pursuant to governmental approvals preparatory to construction of buildings can form the basis of a vested right to build a structure which does not comply with the laws applicable at the time a building permit is issued. By zoning the property or issuing approvals for work preliminary to construction the government makes no representation to a landowner that he will be exempt from the zoning laws in effect at the subsequent time he applies for a building permit or that he may construct particular structures on the property, and thus the government cannot be estopped to enforce the laws in effect when the permit is issued.

553 P.2d at 551.

In *Denning v. County of Maui, supra,* we stated a qualification of the strict rule expressed above, by recognizing that an equitable estoppel may arise which will prevent application of a newly enacted zoning regulation even though a building permit has not been issued. However, the circumstances of the present case do not permit the Developers to rely on *Denning.*

The formulation of the doctrine of equitable estoppel by the trial court, which we said in *Denning* was *not* correct, was:

> If Denning expended substantial sums for the preparation of plans and documents in good faith reliance upon law prior to Ordinance No. 641 and which expenditures were incurred upon the reasonable probability of a building permit being issued then Denning must be allowed the right to proceed.

52 Haw. at 658, 485 P.2d at 1051.

The formulation which we expressed for the trial court's guidance in *Denning* was:

> In order to avoid unnecessary appellate proceedings and for the proper guidance of the trial court, we are of the opinion that for Denning to be allowed the right to proceed in constructing the planned structure the facts must show that Denning had been given assurances of some form by

appellants that Denning's proposed construction met zoning requirements. And that Denning had a right to rely on such assurances thereby equitably estopping appellants from enforcing the terms of Ordinance No. 641.

52 Haw. at 658-59, 485 P.2d at 1051 (footnotes omitted).

What constituted adequate assurances of compliance with zoning requirements and what established a right to rely thereon were left for the trial court's determination in *Denning*. We have that determination to make here, or at least a determination of the likelihood that the Developers will establish an equitable estoppel. It is necessary at the outset to recognize a critical difference in the posture of the Developers from that of the landowner in *Denning*. There the existing ordinance left nothing to be determined by the county authorities except compliance of the proposed development with a set of criteria spelled out in the ordinance. In the present case, on the other hand, the governing ordinance forbade the proposed development, subject only to modification of the application of the ordinance in the legislative discretion of the Council. The Developers could receive assurances that their proposed construction was not prohibited by the IDC Ordinance only by way of action by the Council. Moreover, the IDC Ordinance contained an express limitation on the power, as distinct from the discretion, of the Council, that any such modification must be consistent with proposed amendments to existing land use regulations and with "the health, safety, morals and general welfare."

The Developers must find the assurances they need to satisfy the *Denning* test in the action of the Council on September 21, 1977 and November 10, 1977. These actions were far from unqualified and unambiguous. The approval of the proposed construction expressed by the Council by its action on September 21, 1977 retained for future review and approval the exterior colors, textures and finishes, as well as the details of landscaping. The approval related to plans for a 350 foot, 35 story, 177 unit apartment structure. Whatever justification the Developers may have had for reliance on this action of the Council was withdrawn by the action of the Council on November 10, 1977, when the approval was modified to a

building with an average height of 299 feet and a density of approximately 150 units, with a setback requirement apparently not previously mentioned. The Developers appear not to have contested the authority of the Council to change the terms of its approval, and now seek to establish authority to build only to the configuration approved on November 10, 1977. But that approval was accompanied by substantial qualifications expressed in the accompanying resolution which the Council adopted immediately prior to the vote which approved the plans. The resolution *directed* the Developers to work to effectuate alterations in the project, and to consider "any urban design policy which may emerge", a clear reference to the pending HCS Ordinance, "if this can be done without loss to the interested parties."

It is not possible to read the resolution of November 10, 1977, as the Developers seemingly would have us do, as merely an expression of hope on the part of the Council with no sanction available to the Council to enforce its directives. In my opinion, the action of the Council can reasonably be interpreted only as conditioning its approval upon the satisfactory compliance by the Developers with those directives. Not only did these directives require the Developers to engage in a course of negotiation with other parties which would be subject to subsequent evaluation by the Council, but also the Developers were required to consider changes in the design of the project as necessary to conform to the standards of the HCS Ordinance when enacted. It is clearly implied that the Council was to review the Developers' consideration of these standards and that the Council would have to be satisfied that its directive had been observed before the building permit would issue. Such confirming action on the part of the Council did not take place until October 28, 1978.

These facts do not support equitable estoppel under the *Denning* test. On the date of enactment of the HCS Ordinance the Developers had, instead of assurances that the proposed construction met zoning requirements, only ambiguous promises that the proposed construction would be permitted in the legislative discretion of the Council if the efforts of the Developers subsequent to November 10, 1977 to

comply with the Council's directives were determined to meet some unexpressed standard of sufficiency. Moreover, on that date a substantial question existed whether the plans for the building complied with the building height limit established by the Council on November 10, 1977, which question could be resolved only by a determination by the Council whether building height was to be measured to all points of the structure or only to the roof elevation, excluding the parapet. When the Council enacted the HCS Ordinance on February 25, 1978, it changed the rules laid down on November 10, 1977. Instead of holding the way open to the Developers to qualify the Admiral Thomas project under the IDC Ordinance, the Council withdrew the benefits of the IDC Ordinance and left the Developers with only such rights as they possessed by way of equitable estoppel. The Developers must establish their claim to an equitable estoppel as of February 25, 1978. The facts before us are substantially insufficient to do so and give rise, in my opinion, to a substantial likelihood that appellants will be successful not only in this appeal but also in the litigation.

III.

Likelihood of success, of course, does not alone entitle appellants to a temporary injunction under *Life of the Land v. Ariyoshi, supra*. The balance of irreparable damage must favor the issuance of the injunction and the public interest must support granting the injunction. These issues have not been adequately addressed in these proceedings. It is clear, however, that irreparable damage to the public interest is threatened by the possibility that a substandard structure will be erected illegaly to the detriment of the policy embodied in the HCS Ordinance. It is not a sufficient answer to say that occupancy of an illegal structure may be prevented by actions of the City and County. Removal of the structure would be required in order to avoid the damage to the public interest and we are without any ground for concluding that the Developers would be able, financially and otherwise, to accomplish such removal if the litigation should result unfavorably

to them. This risk might be avoided, and irreparable damage to the public interest insured against, by an adequate bond.

The threatened damage to the public interest is also required to be weighed against the damage which the Developers would suffer as the result of suspension of construction of the building during the effectiveness of a temporary injunction. The balancing of these interests would need to be done in light of the degree of probability of appellants' success as determined by the court.

These questions are outside the range of this dissent. Denial of the requested temporary injunction by the court reflects, I assume, the court's conclusion that likelihood of appellants' success is insufficiently established. My remarks here express my disagreement with that conclusion. The court has not considered the conditions upon which such an injunction might issue. What is said in this part merely calls attention to issues which would have had to be dealt with if the matter had progressed further.

I would act upon the motion for a temporary injunction by entering a finding that the first element of the test laid down in *Life of the Land v. Ariyoshi* has been satisfied by an adequate showing of likelihood of appellants' ultimate success, and by setting the matter for further hearing on the remaining elements of that test.

### DISSENTING OPINION OF OGATA, J.

I am unable to concur with the majority. However, I would not issue the temporary injunction which is sought by plaintiffs-appellants, unless the appellees-developers refuse to furnish the bond hereinafter mentioned.

The appellees-developers have prevailed in the court below on their motion for summary judgment. They are now proceeding to complete the construction of a multi-story structure, the Admiral Thomas condominium project, within the HCS area covered by Ordinance No. 78-18 (hereinafter HCS ordinance), while the plaintiffs-appellants·appeal the adverse ruling on the motion for summary judgment. There is a good likelihood that appellees-developers will complete the

project before this case is finally determined.

In the event that this court should finally hold .that the structure now in the early construction stage is not in accord with the HCS ordinance, and it is illegal, the appellees-developers should be responsible to remove whatever they construct and to restore the premises to the present condition. In order to assure the public that this will be done, I would require from the appellees-developers a deposit of a sufficient bond in a reasonable amount for this purpose. A hearing may be necessary if the parties shall be unable to mutually stipulate on the amount of the bond. It is my opinion that such a requirement is not unreasonable, and is required in this case, since appellees-developers are taking the risks in proceeding with this development before final conclusion of the case.