914 P.2d 1364

Kamuela PRICE, Plaintiff–Appellant,

v.

OBAYASHI HAWAII CORPORATION, Obayashi Corporation, and the City & County of Honolulu, Defendants–Appellees.

No. 16628.*

Supreme Court of Hawai‘i.

April 9, 1996.

---

* By order dated December 23, 1992, this court consolidated Nos. 16373 and 16628.

Walter R. Schoettle, on the briefs, Honolulu, for plaintiff-appellant.

Lloyd S. Yoshioka (Kevin S.C. Chang and Lyle Y. Harada with him on the brief; of Watanabe, Ing & Kawashima), Honolulu, for defendants-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

This appeal is a consolidation of two appeals filed by the plaintiff-appellant Kamuela Price. The first appeal arises from a dismissal following a Notice of Proposed Dismissal issued by the circuit court. The second appeal arises from an order granting a motion for summary judgment, involving the adequacy of an environmental impact statement, in favor of the defendants-appellees Obayashi Hawaii Corporation and Obayashi Corporation (collectively, Obayashi) and the City and County of Honolulu (the city). For the reasons set forth below, we vacate the dismissal following the Notice of Proposed Dismissal and affirm the orders granting summary judgment in favor of Obayashi and the city and against Price.

## I. BACKGROUND

In December 1990, Obayashi submitted a draft environmental impact statement (EIS) pertaining to its proposed Lihi Lani recreational development project in Paumalu and Pupukea, on the North Shore of O'ahu. Notice of the draft EIS was published in the December 8, 1990 and January 23, 1991 issues of the Office of Environmental Quality Control (OEQC) Bulletin. During the thirty-day consultation period and the forty-five day public review period, Obayashi received and responded to comments. A final EIS was submitted in April 1991. Notice of the final EIS was published in the April 23, 1991 OEQC Bulletin. On May 15, 1991, the Department of General Planning notified Obayashi and the OEQC that the final EIS complied with our legal requirements, and therefore, it was accepted.

Complaining that: (1) Obayashi's EIS did not comply with the requirements of Hawai'i Revised Statutes (HRS) Chapter 343; and (2) Obayashi's project would destroy sacred archeological sites, Price filed suit against Obayashi and the city in June 1991 seeking declaratory and injunctive relief. The complaint basically alleged that the EIS did not adequately discuss infrastructure and shoreline preservation concerns.

In March 1992, Obayashi, later joined by the city, moved for summary judgment.[1] The circuit court granted the motion on April 23, 1992. The circuit court then directed the prevailing parties to prepare an acceptable order for signature and filing.[2] On June 27, 1992, before a written order was entered on the motions for summary judgment, the circuit court clerk issued and filed a notice of proposed dismissal for want of prosecution because Price had not filed a pre-trial statement within one year following the filing of the complaint. Price's counsel received the notice on June 30, 1992. Pursuant to the Rules of the Circuit Courts of the State of Hawai'i (RCCH) 12(q), the notice stated that the case would automatically be dismissed without prejudice if objections were not filed within ten days following receipt of the notice.

On July 2, 1992, Price's counsel prepared and attempted to submit objections to the notice of proposed dismissal on the grounds that the circuit court had orally granted the motions for summary judgment on April 23, 1992, and he was awaiting entry of the order and judgment so that he could appeal the decision. Although Price's counsel attempted to tender timely objections to the notice, the circuit court clerk refused to file the objections on the basis that the objections were not accompanied by an affidavit. As authority for this refusal, the clerk cited a memorandum written in December 1983 by Judge Chun, who at that time, was the acting administrative judge of the first circuit court's civil division. Counsel pleaded with the clerk to file the objections explaining that: (1) because he was leaving the state shortly to go to Washington, D.C., and had several urgent matters to attend to first, he did not have time to prepare an affidavit; (2) because RCCH 12(q) does not mention anything about the requirement of an affidavit, there was no need to file one; and (3) because the grounds for his objection, *i.e.*, the fact that summary judgment was orally

granted on April 23, 1992 was a matter of public record, an affidavit was not necessary in this case even if otherwise required. Indicating that he could not ignore the 1983 memorandum, the clerk remained unyielding and refused to file the objections.[3]

After more pleading, the clerk further indicated that he could not file the objections unless counsel first obtained approval from Judge Yim, who was then the administrative judge. Immediately, counsel proceeded to Judge Yim's chambers to request approval; however, he was told that Judge Yim was not there and that he should come back later. Counsel then persuaded the clerk to put a blank time stamp on the objections and left the tendered objections with Judge Yim's chambers, hoping that the document would be approved and filed before the ten-day time period lapsed so that the case would not be dismissed as provided for in RCCH 12(q).

Counsel departed for Washington, D.C. on July 6, 1992, returning to Honolulu on July 10, 1992. On July 13, 1992, the Monday after counsel returned from his trip, he went to Judge Yim's chambers where his objections were returned to him without approval for filing. A copy of Judge Chun's 1983 memorandum was attached. Because the ten-day time period had lapsed, and the case was ostensibly dismissed pursuant to RCCH 12(q), Price filed a notice of appeal (No. 16373). In August 1992 and October 1992, the circuit court entered its orders granting summary judgment in favor of Obayashi and the city, respectively, and against Price. Price then filed a second notice of appeal (No. 16628).

## II. *JURISDICTION*

■ Obayashi first contends that we are without the requisite jurisdiction to address the merits of this appeal. "Jurisdiction is the base requirement for any court considering and resolving an appeal or original action.

---

1. The city joined Obayashi's motion for summary judgment on April 23, 1992.

2. We note that, although the circuit court had orally granted the motions for summary judgment, the case was not disposed at this point because an order had not been entered. *See*

Hawai'i Rules of Civil Procedure (HRCP) 58 ("The filing of the judgment in the office of the clerk constitutes the entry of the judgment; and the judgment is not effective before such entry.").

3. Counsel even unsuccessfully requested a hearing on the affidavit issue.

Without jurisdiction, a court is not in a position to consider the case further." *Wong v. Wong*, 79 Hawai'i 26, 29, 897 P.2d 953, 956 (1995) (citing *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 69 n. 10, 881 P.2d 1210, 1215 n. 10 (1994)); *see also Housing Fin. & Dev. Corp. v. Castle*, 79 Hawai'i 64, 76, 898 P.2d 576, 588 (1995). Thus, before reaching the merits of this appeal, we must address Obayashi's contentions that we lack appellate jurisdiction.

Obayashi contends that we lack appellate jurisdiction to address the merits of the dismissal following the notice of proposed dismissal because: (1) the dismissal was without prejudice; and, in the alternative, (2) the judgment was never set forth in a separate document as required by the Hawai'i Rules of Civil Procedure (HRCP).[4] For the reasons set forth below, we disagree with both of Obayashi's contentions.

### A. *Dismissal Without Prejudice Does Not Affect Appellate Jurisdiction.*

■ Pursuant to HRS § 641–1(a) (1993), we have jurisdiction over appeals "in civil matters from all *final* judgments, orders, or decrees of circuit and district courts ... except as otherwise provided by law." (Emphasis added.) Relying on *Aiona v. Wing Sing Wo Co.*, 41 Haw. 371 (1956) (per curiam) (hereinafter *Aiona I*), Obayashi first claims that, because the circuit court dismissed Price's case "without prejudice," there was no "final judgment [or order] from which an appeal can be taken." Obayashi's reliance on *Aiona I* is inapposite.

In *Aiona I*, the petitioners appealed from an order of the circuit court dismissing their case without prejudice, and this court held as follows:

Although we have heard arguments on the merits of the appeal, we have come to the conclusion that this court should not be concerned with the question of whether the finding ... was, or was not, correct, for *the*

order *dismissing the action being "without prejudice," the petitioners have not thereby been precluded from further action in the lower court and the order appealed from does not have the finality requisite for adjudication of the matter by this court upon appeal.*

Therefore, this court, *sua sponte*, dismisses the appeal, without prejudice.

*Id.* at 372–73 (emphasis added and internal footnote omitted).

While this court's *sua sponte* dismissal in *Aiona I* appears to vindicate Obayashi's contention that a dismissal without prejudice does not constitute a final appealable order, we note that, approximately six years after our decision in *Aiona I*, the parties from *Aiona I* made their way back up to this court for a second round in *Aiona v. Wing Sing Wo Co.*, 45 Haw. 427, 368 P.2d 879 (1962) (per curiam) (hereinafter *Aiona II*). In *Aiona II*, we addressed our prior holding in *Aiona I* with respect to the jurisdictional issue as follows:

[W]e think it proper to state that in our opinion the plaintiffs [in *Aiona I*] were entitled to appeal ... from the compulsory nonsuit ordered against them. *See Central Transp. Co. v. Pullman's Car Co.*, 139 U.S. 24 [11 S.Ct. 478, 35 L.Ed. 55]; 2 Am.Jur., *Appeal and Error*, § 82. This court had reviewed compulsory nonsuits previously, as illustrated by *Garcia v. Mendonca*, 7 Haw. 194; *Territory v. McCandless*, 16 Haw. 728; *Lyu v. Shinn*, 40 Haw. 198; *Schimmelfennig v. Grove Farm Co.*, 41 Haw. 124. The words "without prejudice" did not make the present case unique; in *Territory v. McCandless, supra*, this court expressly declared that the dismissal was without prejudice but this did not affect the status of the appeal. *Accordingly, we are of the opinion that review of the order ... should have been accorded in the former appeal even though*

4. Obayashi further contends that, because the case below was dismissed, pursuant to the RCCH 12(q) notice of proposed dismissal, before the orders granting summary judgment were filed and entered, the circuit court was technically without jurisdiction to enter the subsequent orders, and consequently, we cannot address the

propriety of the orders granting summary judgment. However, because of our holding that the case was never "dismissed" pursuant to RCCH 12(q), *see infra* Part IV.A., we disagree and hold that the circuit court had jurisdiction to enter the orders for summary judgment.

*the dismissal of the suit effected by that order was without prejudice.*

*Id.* at 430, 368 P.2d at 881 (emphasis added). As evidenced by the foregoing language, in *Aiona II,* we expressly disapproved of our holding in *Aiona I.* Accordingly, Obayashi's reliance on *Aiona I* as authority for the proposition that a dismissal without prejudice lacks the finality required for purposes of appellate jurisdiction is misplaced.

B. *The Requirements Of HRCP 58 Were Not Met; However, Because This Is A "Pre–Jenkins Case," We Have Jurisdiction To Consider The Merits Of This Appeal.*

■ Alternatively, Obayashi contends that, because no "separate judgment" was filed as required by HRCP 58, we do not have appellate jurisdiction to review the dismissal following the notice of proposed dismissal.

HRCP 58 provides in relevant part:

The filing of the judgment in the office of the clerk constitutes the entry of the judgment; and the judgment is not effective before such entry. The entry of the judgment shall not be delayed for the taxing costs. *Every judgment shall be set forth on a separate document.*

(Emphasis added.) "The separate document provision was added to HRCP 58 by order of this court on July 26, 1990 and has been generally ignored by practitioners and circuit courts alike." *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 118, 869 P.2d 1334, 1337 (1994) (per curiam).

In *Jenkins,* we held, *inter alia,* that "[a]n appeal may be taken from circuit court orders resolving claims against parties *only* after the orders have been reduced to a judgment and the judgment has been entered in favor of and against the appropriate parties pursuant to HRCP 58." *Id.* at 119, 869 P.2d at 1338 (emphasis added). In the instant case, both parties concede that no separate written order or judgment was ever filed subsequent to the notice of proposed dismissal. Although RCCH 12(q) does not mention the necessity of filing a separate document, HRCP 58, as amended in 1990, expressly requires that "every judgment be

set forth on a separate document." We therefore agree with Obayashi that the strict requirements of HRCP 58 were ignored in this case.

However, while we agree that the separate judgment requirement of HRCP 58 was ignored, we also recognized in *Jenkins* that

rigid enforcement of HRCP 58 and application of our holding[ ] in this opinion to cases currently pending before this court and the Intermediate Court of Appeals would work an unnecessary hardship on those who have relied upon our prior case law. *We will not rigidly apply the Rule 58 requirements of a separate judgment or our holdings in this opinion to appeals currently pending. However, for all appeals from circuit courts filed after March 31, 1994, we will enforce strict compliance with the separate document requirement of HRCP 58.*

*Id.* (emphasis added).

In the instant case, the notice of appeal following the notice of proposed dismissal was filed on August 4, 1992—over a year and a half prior to the date we set in *Jenkins* for strict enforcement of the separate document requirement of HRCP 58. As such, because this is a "pre-*Jenkins*" case, we will overlook the failure to strictly comply with the requirements of the separate judgment rule.

For the foregoing reasons, we hold that we have jurisdiction to address the merits of this appeal.

III. *STANDARDS OF REVIEW*

A.

■ We are first called upon to determine whether the circuit court erred in imposing a requirement that objections to a proposed dismissal pursuant to RCCH 12(q) must be accompanied by an affidavit. "When interpreting rules promulgated by the court, principles of statutory construction apply." *State v. Lau,* 78 Hawai'i 54, 58, 890 P.2d 291, 295 (1995) (citation omitted). "Interpretation of a statute is a question of law which we review *de novo.*" *Id.* (citation omitted). Consequently, interpretation of RCCH 12(q) is a question of law reviewable *de novo.*

### B.

We must next review the circuit court's orders granting summary judgment in favor of Obayashi and the city. We review the circuit court's award of summary judgment under the rule reiterated in *Heatherly v. Hilton Hawaiian Village Joint Venture,* 78 Hawai'i 351, 893 P.2d 779 (1995):

> On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. In other words, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law."

*Id.* at 353, 893 P.2d at 781 (citations omitted); HRCP 56(c) (1990).

### IV. *DISCUSSION*

#### A. *First Appeal: Notice Of Proposed Dismissal*

This case presents us with the opportunity to confront a vexing problem relating to the filing of documents in the lower courts. We must determine whether the circuit court erred in requiring that objections to a notice of proposed dismissal pursuant to RCCH 12(q) be accompanied by an affidavit. On appeal, Price argues that RCCH 12(q) contains no such requirement and, therefore, the circuit court clerk erroneously refused to file his objections based on an unauthorized prerequisite. For the reasons set forth below, we agree.

Article VI, section 7 of the Hawai'i Constitution provides that "[t]he supreme court shall have power to promulgate rules and regulations in all civil and criminal cases for all courts relating to process, practice, procedure and appeals, which shall have the force and effect of law." Pursuant to our constitutional rule-making power, this court promulgated RCCH 12(q). RCCH 12(q) provides as follows:

**Dismissal for Want of Prosecution.** Where no pretrial statement has been filed within 1 year after a complaint has been filed or within any further period of extension granted by the court, the clerk shall notify in writing all parties affected thereby that the case will be dismissed for want of prosecution unless objections thereto showing good cause (specific reasons) are filed within 10 days after receipt of such notice. If objections are not filed within said 10–day period or any extension granted by the court, the case shall stand dismissed without prejudice without the necessity of an order of dismissal being entered therein. Where objections are filed within said 10–day period or any extension granted by the court, the court shall hear said objection upon notice and determine whether the case should be dismissed.

(Bold in original.)

In the instant case, because Price failed to file a pretrial statement within one year after his complaint had been filed, the circuit court issued a notice of proposed dismissal on June 27, 1992. According to the record, Price received the notice on June 30, 1992. Shortly thereafter, on July 2, 1992, Price's attorney attempted to tender a timely objection to the notice of proposed dismissal as required by RCCH 12(q). The objection stated as follows:

> Comes now Plaintiff, KAMUELA PRICE, pursuant to Rule 12(q) of the Rules of the circuit courts of the State of Hawaii and objects to the Notice of Proposed Dismissal, filed herein on June 27, 1992, upon the grounds that Motion for Summary Judgment filed by Defendants OBAYASHI HAWAII CORPORATION and OBAYASHI CORPORATION, was granted by the court on April 23, 1992, but the written order and judgment have not yet been entered. Plaintiff intends to appeal the Judgment in favor of Defendants after judgment has been filed and entered.

However, according to an affidavit prepared and signed by Price's counsel, the circuit court clerk refused to file the objection because it was not accompanied by an affidavit. As authority for this refusal, the

clerk cited a memorandum written in 1983 by the acting administrative judge. The 1983 memorandum provided in relevant part as follows:

> OBJECTIONS TO ORDERS OF DISMISSALS *must be accompanied by an affidavit stating the reasons for the objection.* Also, relevant documents (notice of bankruptcy stay, etc.) may be attached as exhibits.

(Emphasis added.)

Price's counsel pleaded with the clerk to file his objection before he departed for Washington, D.C. In addition, he left his objection with the chambers of the circuit court's administrative judge, requesting that the objection be filed before he returned to Honolulu and the ten-day time period for filing lapsed. Nonetheless, the objection was never filed. Based on our review of the record, the objection tendered by Price's counsel was never filed solely because it did not comply with the 1983 memorandum requiring an accompanying affidavit.

Price contends, and we agree, that RCCH 12(q) does not mandate that objections to notices of proposed dismissals be accompanied by an affidavit before they may be filed. RCCH 12(q) merely requires that objections show "good cause (specific reasons)." However, even this requirement is not a prerequisite to filing. Under RCCH 12(q), once the "objections are *filed* within the 10–day period or any extension granted by the court, *the court* shall hear said objection ... and determine whether the case should be dismissed." (Emphasis added.) Thus, even if objections ostensibly fail to show good cause, the clerk of the court must still file them as long as they are tendered within the designated time period, *i.e.,* ten days or, if an extension is granted by the court, when such extended time period expires. In fact, the *only* prerequisite to the filing of such objections contained in RCCH 12(q) is that they be filed timely.

While a requirement that objections be accompanied by an affidavit may be a perfectly logical approach towards preventing attorneys and *pro se* plaintiffs from tendering unverified statements in opposition to notices of proposed dismissals, the fact re-

mains that RCCH 12(q) contains no such requirement. The Hawai'i Constitution delegates to the "supreme court ... power to promulgate rules and regulations." *See* Art. VI, sec. 7. In the instant case, the mechanical application of the 1983 memorandum written by the then presiding administrative judge effectively modified a rule promulgated by this court pursuant to its constitutional rule-making authority. Such a modification was entirely unauthorized. We therefore hold that the circuit court erred in refusing to file the objection tendered by Price's counsel, and we hereby revoke the memorandum.

Generally, in cases such as the one before us, where the clerk of the court, for whatever reason, fails to file a document proffered in a timely manner by an attorney or a *pro se* party, the party proffering the document is left without a remedy. This is because, if the document is not filed within the allotted time period, the case is automatically dismissed. And because the document is never filed, there is nothing in the record to indicate that the party attempted to file it in a timely manner. Thus, the party has no basis for appeal.

■ However, in this case, Price's attorney created the necessary record for review. Instead of conceding defeat when the circuit court clerk refused to file his objections, he persuaded the clerk to place a blank time stamp on his objection. He then made sure that his objection, along with a sworn affidavit explaining the events that transpired, made their way into the record on appeal. The official time stamp, although not signed by the clerk, indicates that his objection was tendered on July 2, 1992, at 11:03 a.m. The time and date are supported by counsel's sworn affidavit and are well within the ten-day time period allotted by the RCCH 12(q) notice of proposed dismissal, which was received by counsel on June 30, 1992. Therefore, although the objection was never "actually" filed, we now deem Price's objection to the notice of proposed dismissal to have been timely filed because: (1) the clerk arbitrarily and unreasonably refused to file it; and (2) the record unequivocally demonstrates that, had the objection been filed, it would have been filed in a timely manner.

This does not end our inquiry, however. We must now determine whether the objection stated "good cause" to reinstate the case. As grounds for his objection to the notice of proposed dismissal, Price stated that summary judgment had been orally granted in favor of Obayashi on April 23, 1992—approximately two months prior to his receipt of the notice of proposed dismissal. According to Price, he was just waiting for the order to be entered and filed so that he could file a timely appeal.

In our view, Price's objection clearly provided "good cause" to support his rationale for failing to file a pretrial statement within the one year time period designated by RCCH 12(q). Summary judgment had been granted, and there was not going to be a trial. Accordingly, it would have been superfluous to file a *pretrial* statement. Therefore, because Price's objection to the notice of proposed dismissal was (1) timely filed and (2) stated good cause in support of his reasons for not filing a pretrial statement, we hold that the "dismissal" provided by RCCH 12(q) never took affect.[5]

We note that, in 1991, the United States Supreme Court dealt with a similar problem by amending Rule 5(e) of the Federal Rules of Civil Procedure (FRCP) to make it clear that federal clerks *"shall not refuse to accept for filing"* any paper presented for that purpose solely because it is not presented in proper form as required by [the FRCP] or any local rules or practices." FRCP Rule 5(e) (1991) (emphasis added). The advisory committee explained the reasons for the 1991 amendment to FRCP Rule 5(e) as follows:

> Several local district rules have directed the office of the clerk to refuse to accept for filing papers not conforming to certain requirements of form imposed by local rules or practice. *This is not a suitable role for the office of the clerk, and the practice exposes litigants to the hazards of time bars; for these reasons, such rules are proscribed by this revision. The enforcement of these rules and of the local rules is a role for a judicial officer. A clerk may of course advise a party or counsel that a particular instrument is not in proper form, and may be directed to so inform the court.*

(Emphasis added.)

We believe that the reasoning supporting the amendment to FRCP Rule 5(a) is compelling. We also believe that the enforcement of rules promulgated by this court is a role more properly suited to judicial officers. And because we seek to avoid the injustices associated with documents submitted by attorneys and *pro se* parties that, for whatever reason, are never filed, we now declare that, as long as documents in question are tendered within the time period prescribed by our rules, the clerks of the courts *must* file them.[6]

5. We note that our holding is consistent with the record, inasmuch as the court entered and filed its oral rulings granting summary judgment in favor of Obayashi and the city *after* the dismissal following the notice of proposed dismissal was supposed to have taken effect. If the dismissal had actually taken effect, the circuit court would have been without jurisdiction to enter and file its orders granting summary judgment.

6. However, we note that our decision today is taken in light of a pilot project, instituted in the circuit and district courts of the first judicial circuit, which will ultimately determine the fate of this issue. In our order dated November 22, 1995, we stated:
> Upon consideration of the First Circuit Court's request to implement a demonstration pilot project about the filing of documents presented for filing,
> IT IS HEREBY ORDERED that, any other rule or administrative memorandum to the contrary notwithstanding, the clerks of the Circuit Court of the First Circuit shall not refuse to accept for filing, on grounds the document is not presented in proper form, any document presented by a party to a case, provided: (1) the clerks need not file any document that requires the signature of a judge until the signature is affixed; and (2) except for notices of appeal or cross-appeal, the clerk shall strike any document for which a filing fee is required if the fee is not paid or a written request for waiver of the fee is not requested by the close of business on the work day following the date the document was first presented for filing. The clerk shall notify, in a timely manner, any party whose document has been stricken.
> IT IS FINALLY ORDERED that this order is effective thirty days after its entry and for one year thereafter, unless modified, vacated, or replaced by order of this court.
Hawai'i Supreme Court Order, In the matter of Documents Presented for Filing in the Circuit Court of the First Circuit (Nov. 22, 1995). *See also* Hawai'i Supreme Court Order, In the mat-

B. *Second Appeal: Summary Judgment*

Price's second appeal concerns the grant of summary judgments in favor of Obayashi and the city and against Price. Before discussing the summary judgment issue, a discussion of the environmental review process is in order, so that a proper perspective of the significance of an environmental impact statement (EIS) and the role it plays in the environmental review process can be detailed.

1. *The environmental review process*

Projects or developments within the State of Hawai'i may be subject to the Hawai'i EIS laws that require the developer to begin an extensive environmental review process to determine if the benefit of the proposed development outweighs any detriment to the surrounding community.[7] Once a proposed action is subject to the environmental review process, an environmental assessment is made by the applicant and is used to evaluate the possible environmental effects of a proposed action. State of Hawai'i, Office of Environmental Quality Control, *A Guidebook for the Hawai'i State Environmental Review Process* 8 (1992) [hereinafter *Guidebook* ]. The agency reviewing the assessment then determines if there are "significant" environmental impacts anticipated.[8] If there is a determination that there may be "significant" environmental impacts, the accepting agency then files an EIS preparation notice with the OEQC, which in turn publishes the notice in the OEQC bulletin. "Publication of this notice initiates a 30 day consultation period during which the public and interested agencies or organizations may submit written comments regarding adverse effects of the proposed action." *Guidebook* at 8. "The proposing agency or applicant must respond in writing and address all concerns and questions before proceeding with the development

of the EIS." *Id.* Once this phase of the process is complete, the applicant then begins preparation of the EIS.

An EIS is defined in HRS § 343–2 (1993) as

an informational document prepared in compliance with the rules adopted under [HRS] § 343–6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic and social welfare of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.

The initial statement filed for public review shall be referred to as the draft statement and shall be distinguished from the final statement which is the document that has incorporated the public's comments and the responses to those comments. The final statement is the document that shall be evaluated for acceptability by the respective accepting authority.

A "draft" EIS must conform to the requirements of Hawai'i Administrative Rules (HAR) § 11–200–17. The draft EIS is first submitted to the accepting authority for review. Submitting the draft EIS "initiates a 45–day review period during which the public and other agencies may review the draft EIS and submit their written comments to the preparer of the EIS. All comments must be responded to in writing and both comments and responses will be included in the final EIS which is submitted to the approving authority for acceptance." *Guidebook* at 9.

The final EIS is then required to be "accepted" by the accepting authority, in this case, the Department of General Planning of the City and County of Honolulu, before the

ter of Documents Presented for Filing in the District Court of the First Circuit (Feb. 8, 1996).

7. Under Hawai'i EIS law (HRS Chapter 343), there are eight conditions that trigger the environmental review process: (1) use of State or County lands or funds; (2) use of State conservation district lands; (3) reclassification of State conservation district lands; (4) use within the shoreline setback area; (5) use within the Waikiki special district; (6) use within any historic

site or district; (7) an amendment to a County general plan; and (8) construction or modification of a helicopter facility. State of Hawai'i, Office of Environmental Quality Control, *A Guidebook for the Hawai'i State Environmental Review Process* 6–7 (1992).

8. "Significant" environmental impacts are described in Section 11–200–12 of the State of Hawai'i Department of Health Environmental Impact Statement Rules.

proposed action or project can proceed to the permitting stage.[9] *Guidebook* at 9. If the final EIS is accepted, the accepting agency files a notice of acceptance with the OEQC which publishes the acceptance in its bulletin. "If an aggrieved party wishes to challenge the acceptance of an EIS, they may appeal the decision directly to the accepting agency, or file suit in circuit court [under HRS § 343–7(c)] within the 60 day challenge period." *Id.* However, an "acceptance" of the EIS is not an "approval" of the project. "Approval or disapproval of a project occurs after the EIS process is completed and [the] necessary agency permits are issued or denied." *Id.* at 17.

The final EIS is the basis for the decision-making body, *e.g.*, the City Council, to make its decision as to either approval or disapproval of the project in question. Once the project is approved, construction may commence.

### a. *The adequacy of an EIS is a question of law.*

We now address the issues involving the orders granting summary judgment in favor of Obayashi and the city.

Price asserts that summary judgment is inappropriate in this case because there is a conflict in expert opinions. Price presented expert testimony, which contradicted Obayashi's experts, and argued that because there was a disagreement between experts, the EIS was not adequate to permit the decision maker to make an informed decision. In other words, Price reasons that because there is a conflict in expert opinions as to the adequacy of the EIS, there is a genuine issue of material of fact that precludes the grant-

ing of summary judgment in favor of Obayashi.[10]

This court has never ruled on the issue of whether the adequacy of an EIS is a question of law or fact. However, in instances where Hawai'i case law and statutes are silent, this court can look to parallel federal law for guidance. *See Bateman Constr., Inc. v. Haitsuka Bros.*, 77 Hawai'i 481, 486, 889 P.2d 58, 63 (1995); *Koolau Radiology, Inc. v. Queen's Medical Center*, 73 Haw. 433, 444, 834 P.2d 1294, 1300 (1992). Under the auspices of the National Environmental Protection Act (NEPA), federal courts have stated that "the legal adequacy of an environmental impact statement is a question of law...." *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1191 (9th Cir.1988). In *Anson v. Eastburn*, 582 F.Supp. 18 (S.D.Ind.1983), the Federal District Court granted defendants' motion for summary judgment on the counts of the complaint challenging the sufficiency of an EIS. In *Anson*, the plaintiff submitted evidence of conflicting expert opinions on key issues affecting a proposed coal plant. The court held that the conflicting expert opinions did not create a material issue of fact because the EIS was not intended to resolve such issues but rather was intended to provide information to the deciding agency. The court stated:

It is difficult to imagine a situation, such as the case herein where construction of a major project is the central issue, where there would not be disagreements as to the need for the project or as to the scope and content of the investigation which preceded the granting of permits for the project. But, whether or not the parties disagree, or even whether there is authority which conflicts with the agency's decision is not the yardstick by which the sufficiency of

---

9. "[A]cceptance means that all procedures have been followed, the EIS content adequately discloses all identifiable environmental impacts and all review comments have received satisfactory responses." *Guidebook*, at 17. *See* HAR § 11–200–23 (1993).

10. A federal court in *Residents in Protest—I–35E v. Dole*, 583 F.Supp. 653 (D.Minn.1984), denied the plaintiffs' request for an injunction and refused to find that the EIS in question was inadequate, despite expert testimony that it was inadequate. The court stated:

The court finds that both the plaintiffs' and defendants' witnesses are credible witnesses who happen to represent divergent viewpoints of a scientific debate. The National Environmental Policy Act does not require scientific unanimity. Where there is a legitimate debate such as in the present case, the agency responsible for preparing the EIS must make a decision and this court will not substitute its judgment for that of the agency's.

*Dole*, 583 F.Supp. at 662 (citations omitted).

an EIS is to be measured. Rather it is whether the EIS as prepared permitted informed decision making by the agency. *Anson*, 582 F.Supp. at 24 (citations omitted).

Likewise, in *Olmsted Citizens for a Better Community v. United States*, 606 F.Supp. 964 (D.Minn.1985) the plaintiff alleged that an EIS failed both to identify the environmental consequences of a project and to respond to comments made on the draft EIS. In denying plaintiff's claim that the EIS in question was insufficient, the court stated that "[w]hat is required [in the EIS] is disclosure of environmental impacts, and the EIS satisfies this standard as a matter of law." *Id.* at 978.

We therefore hold that the sufficiency of an environmental impact statement is a question of law, which is properly addressed through the summary judgment procedure. This is because the only question presented is whether the EIS complies with applicable statutory mandates, such as HRS chapter 343 and EIS Rules chapter 200. There are no factual determinations to be made regarding EIS adequacy.

Accordingly, we now turn to discuss whether the moving parties are entitled to summary judgment as a matter of law.

b. *Review of the EIS reveals that it adequately discloses significant environmental impacts of the project.*

▮ In order to determine whether Obayashi has demonstrated that it is entitled to summary judgment as a matter of law, we use the "rule of reason" to determine whether the EIS is legally sufficient in adequately disclosing facts to enable a decision-making body to render an informed decision. *Life of the Land v. Ariyoshi*, 59 Haw. 156, 164, 577 P.2d 1116, 1121 (1978).

▮ In *Life of the Land*, we enunciated the standard of review that governs a court's determination as to whether an EIS satisfies the statutory requirements:

> In making such a determination the court is guided by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.[11] *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. den.*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

*Id.* at 164–65, 577 P.2d at 1121 (footnote added).[12]

Furthermore, HAR §§ 11–200–17 and –18 state the minimum content requirements for

---

**11.** The federal courts have addressed the issue of the adequacy of an EIS and have recognized that it is not possible to draft an EIS that is perfect in all respects:

> Congress, we must assume, intended and expected the courts to interpret the NEPA in a reasonable manner in order to effectuate its obvious purposes and objectives. It is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies.

*Environmental Defense Fund, Inc. v. Corps of Engineers of the U.S. Army*, 342 F.Supp. 1211, 1217 (E.D.Ark.1972), *aff'd*, 470 F.2d 289 (8th Cir.1972).

**12.** Generally, federal courts have circumscribed their role in determining the adequacy of an EIS by narrowly limiting their review of the EIS to the issues of whether the statutory procedural requirements were met and whether the EIS "performs its primary task of presenting the decision-maker with an environmentally-informed choice." *Stop H–3 Ass'n v. Lewis*, 538 F.Supp. 149, 159 (D.Haw.1982) (citing *Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir. 1981)).

Using the approach of *Stop H–3 Ass'n*, this court's role, in evaluating whether the EIS complies with statutory requirements, is very narrow. The court does not wish to substitute its judgment for that of an agency within the executive branch of government, specifically, the Department of General Planning. *Stop H–3 Ass'n* emphasized this position by stating that:

> A court is not to substitute its judgment for that of the agency as to the environmental consequences of its action. Rather, the court must ensure that the agency has taken a "hard look" at environmental factors.

a draft and a final EIS, respectively. These sections provide a long list of specific topics that must be included within the EIS. It is important to note that neither HRS Chapter 343 nor the administrative rules of Chapter 200 indicate the level of detail or specificity that should be included on any given subject. The statute and rules were designed to give latitude to the accepting agency as to the content of each EIS. Thus, what is required in one EIS may not be required in another, based upon the circumstances presented by the particular project. Accordingly, the standard to consider the sufficiency of an EIS under the "rule of reason" is that

> an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved

> If the agency has followed the proper procedures, its action will only be set aside if the court finds the action to be "arbitrary and capricious," given the known environmental consequences.
> The court should not be used as a quasi-legislative or quasi-executive forum by those who are dissatisfied with policy decisions made by governing bodies. The environmental laws were neither meant to be used as a "crutch" for chronic fault-finding, nor as a means of delaying the implementation of properly [accepted] projects.

538 F.Supp. at 159 (citations omitted).

Accordingly, courts are reluctant to "second guess" the decision-making body regarding the sufficiency of an EIS. "Courts are not to 'fly speck' EISs, ... but an EIS should not be upheld if it does not 'reasonably [set] forth sufficient information to enable the decision-maker to consider the environmental factors and make a reasoned decision.' " *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 795 F.2d 688, 695 (9th Cir.1986) (quoting *Adler v. Lewis,* 675 F.2d 1085, 1096 (9th Cir.1982)) (citation omitted).

and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*Life of the Land,* 59 Haw. at 164–65, 577 P.2d at 1121.

 Having articulated the standard to be applied in determining the sufficiency of an EIS, we now apply this standard to the areas in the EIS that Price has challenged as being deficient. In his appeal, Price asserts at least twelve areas of concern in the EIS that he considers insufficient.[13] However, our review of the EIS is limited to those concerns that Price listed in his comments to the draft EIS.[14]

Price's comments identified the following "problems" that he had concerning the sufficiency of the EIS:

opers (Obayashi); (4) threats of contamination to levels above those acceptable for drinking water, at least at some times of the year; (5) the potential of damage to the marine environment immediately offshore of the proposed development; (6) changes due to increased nitrate availability resulting from the proposed development runoff, which would alter the compositions of species in the surrounding marine environment; (7) erosion runoff damaging the animals habitat; (8) availability of water for the project; (9) lack of infrastructure in the neighborhood, including inadequate fresh water supply, waste water treatment facilities, and transportation facilities; (10) the proposed solution to the traffic congestion involving widening Kamehameha Highway and the detrimental effect of such widening on the shoreline; (11) the effect of pesticides and herbicides to be used in the operation of the proposed project, which might contaminate the underground water supply, as well as the surface water in the Shark's Cove, by water flowing through underground lava tubes in the area; and (12) the location of native Hawaiian archaeological sites in the proposed project area.

**13.** Price asserts that the EIS prepared by Obayashi was inadequate because there are unaddressed questions concerning: (1) threats to the marine environment regarding erosion and storm runoff, especially during the construction phase; (2) the likelihood of alteration of ground water flow and of seawater intrusion, especially under conditions of inter-annual variation and drought; (3) the potential, which was not sufficiently covered in the EIS, for buildup of nitrates in groundwaters of property owners with land immediately below the bluffs owned by the devel-

**14.** Price's claim of jurisdiction is based on HRS § 343–7(c) (1993), which states in pertinent part:

> Affected agencies and persons who provided written comments to such statements during the designated review period shall be adjudged aggrieved parties for the purpose of bringing judicial action under this subsection; provided that the contestable issues *shall be limited to issues identified and discussed in the written comment.*

(Emphasis added.)

(1) The lack of infrastructure in the neighborhood, including inadequacy of the fresh water supply, inadequacy of the waste water treatment facilities, and inaceqacy [sic] of transportation facilities.

(2) If the proposed solution to the traffic congestion involves widening of Kamehameha Highway, the detrimental effect of such widening on the shoreline must be considered.

(3) The possibility of pesticides and herbicides to be used in the operation of the proposed project contaminating the underground water supply, as well as the surface water in the Shark's Cove by water flowing through underground lava tubes in the area.

(4) The effect of erosion and possible flooding during construction of the project.

(5) The location of native Hawaiian archaeological sites in the proposed project area.

Letter dated January 2, 1991, from Kamuela Price to Mel Murakami, Department of General Planning (Exhibit "A").

 We now address each of these comments in turn.[15] Price's first comment concerns the infrastructure of the proposed project. Price states that the draft EIS provides an inadequate discussion of the infrastructure in the neighborhood, specifically, a lack of discussion on the fresh water supply, waste water treatment facilities, and transportation facilities. A review of the Final EIS reveals that there is an entire section devoted to each of these topics.[16] Within each of these sections is a discussion of existing conditions, anticipated impacts, and mitigating measures. For example, in the

area of water supply infrastructure, the EIS identifies the existing wells, pumps, transmission lines, and storage facilities. Waste water treatment facilities and solid waste disposal facilities are also discussed in detail.

Also, with respect to Price's comment regarding "widening of Kamehameha Highway," the EIS contains a comprehensive discussion of traffic impacts.

Based on our review, we hold that the EIS's discussion concerning infrastructure was compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved.

 Price criticizes the EIS in respect to the lack of discussion of pesticides and herbicides to be used in operation of the proposed project. Again, this comment is properly addressed by the EIS in section 4.5 (Groundwater Resources). Within section 4.5 is a discussion of "Groundwater Impacts Due to Application of Pesticides," as well as herbicides. The discussion of pesticides and herbicides contains at least three studies prepared by experts that detail the impact, effect, and mitigation of pesticide and herbicide usage on the Lihi Lani project.[17] Such studies demonstrate that Obayashi has made good faith efforts to set forth sufficient information to enable the decision-maker to consider fully the environmental factors involved.

Therefore, we hold that the EIS is adequate with respect to its discussion of the environmental impacts from pesticides and

---

15. However, before addressing each concern, we note the scope and depth of the EIS, which discusses the environmental impact on the following topics: climate, topography, soils, agriculture, groundwater resources, surface water, storm water runoff, surface water quality, tsunami/flood hazard, vegetation, wildlife, marine resources, archaeological and historic resources, roadways and traffic, noise, air quality, visual resources, social and economic characteristics, infrastructure, and public services. Although this listing of topics is not exhaustive, it is illustrative of the breath and depth of the EIS in question.

16. Section 4.17 of the Final EIS is entitled "Infrastructure", and includes the following subtopics: Water Supply Facilities, Waste water Facilities, Solid Waste Disposal Facilities, Drainage Facilities, Roadways, and Electrical Supply. Exhibit "A" at ii.

17. *Groundwater Conditions: Pupukea–Paumalu, Oahu*, John F. Mink, Ph.D., June 1988; *Assessment of Potential Impacts, Irrigation of Lihi Lani Golf Course, Pupukea–Paumalu, Oahu*, John F. Mink, Ph.D., Dec. 1990; *Environmental Assessment of Fertilizer, Herbicide and Pesticide Use on the Proposed Lihi Lani Golf Course*, Charles L. Murdoch, Ph.D. and Richard E. Green, Ph.D., Dec. 1990.

herbicides anticipated to be used on the project.

 Price further comments that the EIS inadequately discussed the effects of erosion and possible flooding during construction of the project. A review of the EIS reveals that Obayashi did indeed discuss the effects of erosion. The EIS, in sections 4.6, 4.6.1, and 4.6.2, addresses construction runoff and discloses the proposed new construction and its impact on the landscape, including the increase in erosion and sediment run-off. The EIS indicates that an on-site erosion control plan utilizing sedimentation and retention ponds, cut-off ditches, and temporary ground cover will be constructed by Obayashi. This erosion control plan would comply with relevant local and state ordinances and guidelines. The EIS also contains a report prepared by Dr. Gordon Dugon on run-off and the impact to surrounding areas.

As such, we hold that the EIS's discussion on erosion and sediment runoffs was compiled in good faith and sets forth sufficient information to enable the decision maker to make an informed decision regarding the significant impacts on the environment.

 Price's final comment concerns the location of native Hawaiian archaeological sites in the proposed project area. Obayashi retained the services of Dr. Paul H. Rosendahl, a noted archaeologist, to conduct a field reconnaissance and provide a report and recommendations concerning any archeological finds that would be affected by the proposed project. There is a lengthy discussion on archeology within the EIS and Dr. Rosendahl's report. Dr. Rosendahl explains each and every finding, its location and value, and his recommendations for preservation of historic information. The study was comprehensive and more than adequate to inform the Department of General Planning of the archeological impacts of the project.

Obayashi has presented an EIS that consists of two volumes of material, over 400 pages. Included within the EIS are twenty-four technical reports supporting the recommendations and findings presented. The EIS addresses all of the statutory requirements of HRS chapter 343, and chapter 200, Title 11 of the Administrative Rules. Upon review of the EIS in question, we hold that it is in compliance with the mandates of HRS chapter 343, as well as the applicable administrative rules of chapter 200.

## V. CONCLUSION

For the foregoing reasons, we vacate the dismissal following the notice of proposed dismissal and affirm the orders granting summary judgment in favor of Obayashi and the City & County of Honolulu.[18]

---

18. We decline to entertain the appellees' counterargument involving HRCP 11 sanctions and Hawai'i Rules of Appellate Procedure Rule 38, because we conclude that Price presented a good faith, although unsuccessful, argument.