203 P.3d 658

STOP RAIL NOW, a nonprofit organization; Let Honolulu Vote, a nonprofit organization; League of Women Voters of Honolulu, a nonprofit organization, Sensible Traffic Alternatives & Resources, Inc., dba Honolulu Traffic.Com, a nonprofit organization; Paul De Gracia; Paul E. Smith, Robert Kessler, Warren P. Berry; Jeremy Lam, M.D., Scott R. Wilson; Dennis Callan; and Samuel Slom, Petitioners–Plaintiffs–Appellants,

v.

Denise C. DeCOSTA, in her capacity as City Clerk of the City and County of Honolulu, Respondent–Defendant–Appellee.

No. 29354.

Supreme Court of Hawaiʻi.

Oct. 2, 2008.

Earle A. Partington, on the motion, Honolulu, for Petitioners–Plaintiffs–Appellants.

Don S. Kitaoka, Diane T. Kawauchi, Reid M. Yamashiro, Dawn D.M. Spurlin, Deputies Corporation Counsel, on the motion, for Respondent–Defendant–Appellee.

RECKTENWALD, C.J., WATANABE and LEONARD, JJ.

*AMENDED ORDER OF THE COURT DENYING APPELLANTS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION BY LEONARD, J.*

On September 22, 2008, at 10:00 a.m., Petitioners–Plaintiffs–Appellants' Emergency Motion for Preliminary Injunction Directing the City Clerk to Place Petition 53 of 2008 on the November 4, 2008 General Election Ballot (**ICA Motion**), filed on September 15, 2008, came on for hearing before the Intermediate Court of Appeals (**ICA**). Earle A. Partington, Esq., appeared on behalf of Petitioners–Plaintiffs–Appellants Stop Rail Now, a non-profit organization, Let Honolulu Vote, a non-profit organization, League of Women Voters of Honolulu, a non-profit organization, Sensible Traffic Alternatives & Resources,

Inc., dba Honolulu Traffic.com, a non-profit organization, Paul de Gracia, Paul E. Smith, Robert Kessler, Warren P. Berry, Jeremy Lam, M.D., Scott R. Wilson, Dennis Callan, and Samuel Slom (collectively, **Stop Rail**). Don S. Kitaoka, Esq., and Diane T. Kawauchi, Esq., Deputies Corporation Counsel, appeared on behalf of Respondent–Defendant–Appellee Denise C. DeCosta, in her capacity as City Clerk of the City and County of Honolulu (**City Clerk**).

Upon careful review and consideration of the ICA Motion, the City Clerk's Memorandum in Opposition to the ICA Motion, Stop Rail's Written Submission dated September 19, 2008, the record in this case, applicable statutes, rules, ordinances, charter provisions and cases, and the issues raised by the parties, we resolve the ICA Motion as follows:

As explained hereinafter, based on the arguments and the record before the court, we conclude: (1) this court has appellate jurisdiction; (2) Stop Rail has made a sufficient showing on the merits of their appeal to require us to weigh the issues of irreparable harm and whether the public's interests would be furthered by the requested relief, although there are other potentially meritorious interpretations of the relevant City and County of Honolulu Charter provisions; (3) there is evidence before the court that granting the requested relief could engender unintended, serious, negative consequences for the upcoming general election, including potential disenfranchisement of absentee uniformed services voters and overseas voters, operational and logistical impact to the entire State election timetable, voter confusion, and/or jeopardy to the validity of the votes cast on the issue of rail transit in Honolulu; (4) that harm outweighs the harm that will be suffered by Stop Rail if its form of the ballot question on rail transit is not placed on this year's general election ballot, particularly since the public will have the opportunity to vote on an alternative form of the rail transit question; and (5) therefore, Stop Rail's request for a preliminary injunction is denied.

## I.  RELEVANT FACTS

### A.  Stop Rail's Petition

The relevant facts are not in dispute, except perhaps with respect to the nature and/or degree of the "harm" that would be suffered by the parties and the public upon the granting or denial of the ICA Motion.

On August 4, 2008, Stop Rail submitted to the City Clerk a Petition for Proposed Ordinance by Initiative (**Petition**), purportedly signed by over 49,000 registered voters of the City and County of Honolulu (**Honolulu**), which stated in relevant part:

**PETITION FOR PROPOSED ORDINANCE BY INITIATIVE**

**"Honolulu mass transit shall not include trains or rail transit."**

The following question is being submitted to the People of the City and County of Honolulu to be voted upon at a special election:

**SHALL AN ORDINANCE BE ADOPTED TO PROHIBIT TRAINS AND RAIL TRANSIT IN THE CITY AND COUNTY OF HONOLULU?**

**WE, THE UNDERSIGNED, AS DULY REGISTERED VOTERS IN THE CITY AND COUNTY OF HONOLULU, WITH FULL KNOWLEDGE OF THE CONTENT OF THIS PETITION, PROPOSE AN ORDINANCE SUBSTANTIALLY IN THE MANNER SET FORTH: 1. TO PROHIBIT THE USE OF TRAINS OR RAIL TRANSIT IN ANY MASS TRANSIT SYSTEM WITHIN THE CITY AND COUNTY OF HONOLULU; AND 2. TO BE EFFECTIVE IMMEDIATELY UPON APPROVAL.**

After examining the Petition, the City Clerk informed Stop Rail that she could not accept a petition for a special election at that time because the Revised Charter of the City and County of Honolulu (2000 Ed. & Supp. 2003)[1] (**Charter**) did not permit the holding of an initiative special election within 180 days of a general election.  The Petition was

---

1.  The Charter was further revised by amendments approved in the 2004 and 2006 general elections, as well as a 2007 Honolulu City Council Resolution.  These further revisions are not relevant to the issues before the court.

removed from the City Clerk's office without a determination of the number of valid signatures it contained.

### B. *The Circuit Court Proceeding's*

On August 6, 2008, Stop Rail filed the following documents in the First Circuit Court (**Circuit Court**)[2] in Civil No. 08–1–1605: (1) a Petition for Writ of Mandamus or, Alternatively, Complaint for Declaratory and Injunctive Relief; Summons (**Complaint**),[3] (2) a Motion for Preliminary Injunction, supported by a Memorandum in Support, the Declaration of Dennis Callan (**Callan**), and an exhibit (a copy of one page of the Petition) (**Circuit Court Motion**). In the Circuit Court Motion, Stop Rail sought the following relief:

> [A] preliminary injunction directed to the City Clerk ordering her to file and process the Petition for a special initiative election (as requested in the Petition/Complaint) as required by law and, if sufficient signatures are authenticated, to place the proposed ordinance on the November 4, 2008, general election ballot.

On August 12, 2008, the City Clerk filed a Memorandum in Opposition to the Circuit Court Motion that was supported by the Declaration of the City Clerk and four exhibits (letters from and to John S. Carroll, Esq., an email from Callan, and a page of the Petition that was similar to the page reviewed by the City Clerk on August 4, 2008). On August 13, 2008, Stop Rail filed a Reply Memorandum with no further declarations or exhibits.

On August 14, 2008, the Circuit Court held an expedited hearing on the Circuit Court Motion. No transcript of that hearing was provided to this court. On August 19, 2008, the Circuit Court entered an Order Granting the Circuit Court Motion. On August 21, 2008, an Order of Correction was entered, along with an Amended Order Granting the Circuit Court Motion.

On August 25, 2008, Stop Rail filed a Motion for Partial Reconsideration or, in the Alternative, for Entry of Judgment (**Motion for Partial Reconsideration**) on the grounds that the Circuit Court had erred in its interpretation of the applicable Charter provisions. On August 26, 2008, the City Clerk filed her Answer to Stop Rail's Complaint and on August 29, 2008, the City Clerk filed her Memorandum in Opposition to the Motion for Partial Reconsideration. A hearing on the Motion for Partial Reconsideration was scheduled, on shortened time, for September 3, 2008. Following the September 3, 2008 hearing,[4] the Circuit Court, without any reference to the Motion for Partial Reconsideration, entered a Second Amended Order Granting the Circuit Court Motion (**Second Amended Order**). The Second Amended Order did not change the effect of the Circuit Court's prior ruling, but modified, in some instances, the explanation of the Circuit Court's decision, which granted a preliminary injunction in favor of Stop Rail, required the City Clerk to accept the Petition and certify the number of qualified signatures, and determined, in effect, that 44,525 qualified signatures were needed to place the Petition on the ballot, rather than the lower number of qualified signatures, *i.e.*, 29,454, that Stop Rail maintains is required.

On September 9, 2008, Stop Rail filed a document entitled Petitioners–Plaintiffs' Exhibit 2, which submitted "for the record" the Certificate of the City Clerk regarding her examination of the Petition and tabulation of the total number of qualified, disqualified, or withdrawn signatures on the Petition (**Clerk's Certificate**).

On September 12, 2008, the Circuit Court entered a Judgment in favor of Stop Rail and against the City Clerk on the claim for a

---

**2.** The Honorable Karl S. Sakamoto presided over the Circuit Court proceedings.

**3.** The relief requested in the Complaint included a writ of mandamus, a declaratory judgment, and "a preliminary and permanent injunction directing the City Clerk to file and process the Petition as required by law and, if sufficient signatures are authenticated, to place the pro-

posed ordinance on the November 4, 2008 general election ballot."

**4.** No transcript of the September 3, 2008 hearing was made part of the record on appeal. On September 12, 2008, Stop Rail filed a document entitled, "Certificate that No Transcript of Circuit Court Proceedings Shall be Prepared."

preliminary and permanent injunction, in favor of the City Clerk and against Stop Rail on all remaining claims, and dismissing any and all parties and/or claims. On the same day, Stop Rail filed a Notice of Appeal. As of the date of this order, the City Clerk has not filed a cross-appeal, although the period for filing a cross-appeal has not yet expired.

### C. *The City's Ballot Question*

On August 20, 2008, Resolution No. 08–166, CD1, FD1 (**Reso 08–166**) passed third reading before the Honolulu City Council. Reso 08–166 provides in relevant part:

> WHEREAS, it has been reported by the news media that the Circuit Court of the First Circuit has ruled in favor of "Stop Rail Now" in Civil No. 08–1–1605–08(KKS), and has ordered the city clerk to file and process its initiative petition; and
>
> WHEREAS, the initiative petition of "Stop Rail Now" was filed with the city clerk on August 14, 2008 as Petition 53 (2008); and
>
> WHEREAS, the charter amendment proposed herein will be neither needed nor desirable if the ballot question posed in "Stop Rail Now's" Petition 53 (2008) ("Petition 53 ballot question") is placed on the 2008 general election ballot for a vote by the electorate; and
>
> WHEREAS, the council wishes to place the charter amendment proposed herein on the 2008 general election ballot only if the ballot question posed in Petition 53 (2008) is not placed on the 2008 general election ballot; now, therefore,
>
> BE IT RESOLVED by the Council of the City and County of Honolulu:
>
> 1. That it propose and it is hereby proposed that the following question be placed on the 2008 general election ballot; provided that if the ballot question posed in Petition 53 (2008), either in its original form or as it may be altered or restated pursuant to RCH Section 3–406, is included in the ballot language submitted by the city clerk to the chief election officer of the State of Hawaii pursuant to HRS Section 11–119(b), the following question shall not be placed on the ballot:

> "Shall the powers, duties, and functions of the city, through its director of transportation services, include establishment of a steel wheel on steel rail transit system?"

On August 22, 2008, the Mayor of Honolulu approved Reso 08–166, pursuant to § 15–102(1) of the Charter. Under the terms of Reso 08–166, if Stop Rail's initiative question is *not* placed on the general election ballot, the Charter amendment question of Reso 08–166 will be placed on the general election ballot.

### D. *The Supreme Court Proceedings*

On August 26, 2008, Stop Rail filed a Petition for Writ of Mandamus in the Hawai'i Supreme Court, seeking: (1) a declaration that "the 'fifteen percent' and 'ten percent' from the charter subsection refer to the same standard—the number of *actual* voters in the last general mayoral election;" and (2) a writ of mandamus directed to the Circuit Court "ordering the circuit court to so hold and to direct the City Clerk to place the proposed ordinance on the November 4, 2008, general election ballot if she finds duly authenticated signatures equal to ten percent of the number of *actual* voters in the last mayoral election." On September 3, 2008, the supreme court entered an order denying the requested relief based on the conclusion that Stop Rail had not demonstrated an entitlement to mandamus relief.

### E. *The ICA Proceedings*

The ICA Motion was filed on September 15, 2008, and was supported by a memorandum and three exhibits, i.e., the Clerk's Certificate, the Circuit Court's Second Amended Order, and the Judgment entered below. Citing Hawai'i Rules of Appellate Procedure (**HRAP**), Rule 27, Stop Rail moved this court, "for a preliminary injunction directing Defendant–Respondent–Appellee City Clerk to place Petition 53 of 2008 on the November 4, 2008 ballot."

Upon this court's initial review, on September 17, 2008, we entered an order establishing an expedited deadline for the City Clerk's response to the ICA Motion. On

September 18, 2008, this court entered an order setting the ICA Motion for hearing on September 22, 2008, and requesting that the parties address certain issues through written submissions or at the hearing on the ICA Motion.

On September 19, 2008, the City Clerk filed a Memorandum in Opposition to the ICA Motion, supported by declarations of counsel and the City Clerk, as well as fourteen exhibits, including the City Clerk's Memorandum in Opposition to Stop Rail's Motion for Partial Reconsideration by the Circuit Court, the Second Amended Order, the supreme court's order, various correspondence related to the entry of judgment (and a proposed order) by the Circuit Court, the Judgment, and seven exhibits responding to this court's inquiries regarding the disputed Charter provisions.

On September 19, 2008, Stop Rail filed a Written Submission, responding to the issues raised in this court's September 18, 2008 order, including clarification that the relief requested in the ICA Motion is governed by HRAP Rule 8(a), and submitting four additional exhibits in support of the ICA Motion, i.e., a copy of the Circuit Court Motion, a copy of the supreme court's order, and two exhibits responding to this court's inquiries regarding the disputed Charter provisions.

As noted above, this matter came on for hearing before the court at 10:00 a.m. on September 22, 2008.

## II. PROCEDURAL POSTURE OF AND STANDARDS APPLICABLE TO THE ICA MOTION

To be clear, this is not a decision on an expedited appeal from the order (s) and judgment of the Circuit Court. The appeal from the Circuit Court has not been briefed. The deadline for a cross-appeal has not expired. The matter before this court is a motion for an injunction pending an appeal, which is governed by HRAP Rule 8(a), which provides in relevant part:

(a) **Motions for Stay, Supersedeas Bond or Injunction in the Appellate Courts.** A motion for stay of the judgment or order in a civil appeal, or for approval of a supersedeas bond, or for an order suspending, modifying, restoring, or granting an injunction during the pendency of an appeal shall ordinarily be made in the first instance to the court or agency appealed from.

A motion for such relief on an appeal may be made to the appellate court before which the appeal is pending or to a judge thereof, but, if the appeal is from a court, the motion shall show that application to the court appealed from for the relief sought is not practicable, or that the court appealed from has denied an application, or has failed to afford the relief the applicant requested, with the reasons given by the court appealed from for its action. The motion shall also show the reasons for the relief requested and the facts relied upon, and, if the facts are subject to dispute, the motion shall be supported by affidavits, declarations, or other sworn statements or copies thereof. With the motion shall be filed such copies of parts of the record as are relevant.

■ Generally, the standard for a preliminary injunction is: (1) whether the moving party has shown that it is likely to succeed on the merits; (2) whether the balance of irreparable harms favors the issuance of an injunction; and (3) whether the public interest supports granting such an injunction. *See, e.g., Office of Hawaiian Affairs v. Hous. and Cmty. Dev. Corp. of Haw.,* 117 Hawai'i 174, 212, 177 P.3d 884, 922 (2008). This standard has been most frequently applied to a trial court's consideration of a motion for preliminary injunction or an appellate court's review of a trial court's decision on such motion.

It appears, however, that a stronger showing on the merits may be required when a party seeks an injunction pending appeal. *See, e.g., Life of the Land, Inc. v. City Council of the City and County of Honolulu,* 60 Haw. 446, 447, 592 P.2d 26, 27 (1979) ("In order for an appellant to obtain an injunction pending appeal, there must be a showing that he is threatened with irreparable injury and that there is *substantial likelihood* that he will prevail on the merits of his appeal.") (emphasis added); *Life of the Land v. Ariyo-*

*shi*, 59 Haw. 156, 165, 577 P.2d 1116, 1122 (1978) (holding that appellant had failed to establish a prima facie case on the merits, "much less a showing of substantial likelihood of success"); *MDG Supply, Inc. v. Diversified Inv., Inc.*, 51 Haw. 480, 482, 463 P.2d 530, 532 (1969) ("[T]here must be a showing that appellant is threatened with irreparable injury and that there is great likelihood, approaching near certainty, that he will prevail.") (citations omitted). While the rule permitting an appellate court to grant injunctive relief pending an appeal has shifted from the rules of civil procedure to the rules of appellate procedure, we are aware of no cases interpreting HRAP Rule 8(a), and the aforementioned cases continue to be cited favorably (particularly the *Life of the Land* cases) and have not been overruled.

We recognize, too, that, if a court is able to conclude that a prima facie case has been made in support of the movant's position on the merits of a case, the weight attached to the various elements may vary, and a strong showing of irreparable harm may reduce the weight given to any lack of likelihood of success on the merits. *See, e.g., Office of Hawaiian Affairs*, 117 Hawai'i at 211–12, 177 P.3d at 921–22 ("[T]he more the balance of irreparable damage favors issuance of the injunction, the less the party seeking the injunction has to show the likelihood of his success on the merits.") (citation omitted); *Life of the Land v. Ariyoshi*, 59 Haw. at 165, 577 P.2d at 1122 ("We recognize that the weight to be attached to the various elements of the test may vary, and that a strong showing of irreparable harm may reduce the weight given to any lack of likelihood of success on the merits.") (citation omitted). The opposite proposition is, of course, true as well. A strong showing on the merits may reduce, but not eliminate, the moving party's burden on the issues of irreparable harm and public interest. *See Penn v. Transp. Lease Haw., Ltd.*, 2 Haw.App. 272, 276, 630 P.2d 646, 650 (1981) ("[T]he greater the probability that the party seeking the injunction is likely to prevail on the merits, the less he has to show that the balance of irreparable damage favors issuance of the injunction.")

Finally, we recognize that the relief sought by Stop Rail is in the nature of a mandatory injunction. A mandatory injunction compels one to perform an affirmative act in order to do or undo a previous act. *Wahba, LLC v. USRP (Don), LLC*, 106 Hawai'i 466, 472, 106 P.3d 1109, 1115 (2005). The purpose of an injunction, in general, is to "protect property or other rights from irreparable injury by prohibiting or commanding certain acts." *Morgan v. Planning Dept., County of Kauai*, 104 Hawai'i 173, 188, 86 P.3d 982, 997 (2004) (citations omitted). Most injunctions are "prohibitory," meaning that "the matter complained of is a consequence of present conduct and the injunction simply orders a defendant to refrain from engaging in the designated acts." *Wahba*, 106 Hawai'i at 472, 106 P.3d at 1115 (citation omitted). A mandatory injunction is distinguishable from a prohibitory injunction in that a "mandatory injunction commands performance of certain acts whereas a prohibitory injunction prohibits the performance of certain acts." *Legal Aid Soc'y of Haw. v. Legal Serv. Corp.*, 961 F.Supp. 1402, 1408 n. 3 (D.Haw.1997).

The Hawai'i Supreme Court has cautioned that "[m]andatory preliminary relief which goes well beyond the status quo is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Wahba*, 106 Hawai'i at 472, 106 P.3d at 1115 (citations and internal quotation marks omitted). That court further stated that "[t]he severity of a mandatory injunction makes it a disfavored option which courts should deny unless the facts and law clearly favor the injured **party.**" *Id.* (citations and internal quotation marks omitted).

## III. DISCUSSION

### A. Jurisdiction

Hawai'i Revised Statutes (**HRS**) § 641–1 (1993 & Supp.2007) authorizes appeals to the ICA from "final judgments, orders, or decrees[.]" HRS § 641–l(a). Appeals under HRS § 641–1 "shall be taken in the manner ... provided by the rules of court." HRS § 641–l(c). Rule 58 of the Hawai'i Rules of Civil Procedure (**HRCP**), requires that "[e]very judgment shall be set

forth on a separate document." Based on this requirement, the supreme court has held that "[a]n appeal may be taken ... only after the orders have been reduced to a judgment and the judgment has been entered in favor of and against the appropriate parties pursuant to HRCP [Rule] 58[.]" *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 119, 869 P.2d 1334, 1338 (1994).

> [I]f a judgment purports to be the final judgment in a case involving multiple claims or multiple parties, the judgment (a) must specifically identify the party or parties for and against whom the judgment is entered, and (b) must (i) identify the claims for which it is entered, and (ii) dismiss any claims not specifically identified[.]

*Id.*

On its face, the September 12, 2008 Judgment resolves all claims against all parties by doing the following:

— expressly entering judgment "in favor of Petitioners–Plaintiffs and against Respondent–Defendant City Clerk on the claim for a preliminary and permanent injunction;"

— expressly entering judgment "in favor of Respondent–Defendant City Clerk and against Petitioners–Plaintiffs on all remaining claims which claims are hereby dismissed with prejudice;" and

— expressly dismissing any claims not specifically identified by providing that "[a]ny remaining parties and/or claims are dismissed."

Therefore, the September 12, 2008 Judgment satisfies the requirements for an appealable final judgment under HRS § 641–

l(a), HRCP Rule 58, and the holding in *Jenkins.*

Stop Rail timely filed their Notice of Appeal on September 12, 2008. *See* HRAP Rule 4(a)(1). Accordingly, it appears that the ICA has jurisdiction over this case pursuant to HRS § 641–1(a).[5]

The City Clerk argues that this court lacks jurisdiction for two reasons:

(1) Stop Rail filed the Notice of Appeal before the Circuit Court entered a written order that disposed of Stop Rail's Motion For Partial Reconsideration; and

(2) When the Circuit Court entered the Judgment, the Circuit Court resolved Stop Rail's prayer for a permanent injunction even though the Circuit Court had not previously entered an order adjudicating the request for a permanent injunction.

With respect to the first argument, we note that the Motion for Partial Reconsideration did *not* request reconsideration of the Judgment; it merely requested reconsideration of the Amended Order, which, by itself, was a non-appealable interlocutory order. HRCP Rule 59(e) refers only to reconsideration of a "judgment."[6] HRCP Rule 54(b) is applicable to the reconsideration of a pre-judgment interlocutory order, because HRCP Rule 54(b) provides that an "order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." The tolling provision in HRAP Rule 4(a)(3) applies to a motion to reconsider a "judgment," not an interlocutory order. Thus, Stop Rail's Mo-

5. We note that "[a]n appeal from a final judgment brings up for review all interlocutory orders not appealable directly as of right which deal with issues in the case." *Ueoka v. Szymanski,* 107 Hawai'i 386, 396, 114 P.3d 892, 902 (2005) (citation and internal quotation marks omitted).

6. We note that, if the Motion for Partial Reconsideration were considered to be a premature motion for reconsideration pursuant to HRCP Rule 59(e), the Circuit Court's failure to enter a written order disposing of the motion would not nullify Stop Rail's Notice of Appeal. The City Clerk cited two cases in support of the argument

that, "[a]ccording to Hawaii Rules of Appellate Procedure Rule 4(a)(4) (1996), an appeal filed while a motion for reconsideration is pending 'shall have no effect.'" *Nakato v. Macharg,* 89 Hawai'i 79, 86, 969 P.2d 824, 831 (App.1998); *Kamaole Two Hui v. Aziz Enter., Inc.,* 9 Haw.App. 566, 571, 854 P.2d 232, 235 (1993). These cases were both based on an earlier version of HRAP Rule 4. The supreme court amended HRAP Rule 4 on December 6, 1999, so that, effective January 1, 2000, HRAP Rule 4 no longer states that an appeal filed while a motion for reconsideration is pending shall have no effect.

tion for Partial Reconsideration did not invoke the tolling provision in HRAP Rule 4(a)(3) and the City Clerk's first argument fails.

■ We also reject the City Clerk's second argument that the ICA lacks appellate jurisdiction because the Judgment resolved Stop Rail's request for a permanent injunction before the Circuit Court actually adjudicated it. The Circuit Court's error, if any, in granting a permanent injunction does not impact the issue of appellate jurisdiction. An appeal will not be dismissed for lack of appellate jurisdiction merely because a trial court erred in its adjudication of a substantive issue. Instead, "an appeal from any judgment will be dismissed ... [for lack of jurisdiction] if the judgment does not, *on its face*, either resolve all claims against all parties or contain the finding necessary for certification under HRCP [Rule] 54(b)." *Jenkins*, 76 Hawai'i at 119, 869 P.2d at 1338. As long as the judgment, *on its face*, resolves all claims against all parties, the judgment is an appealable final judgment. The issue of whether the judgment *incorrectly* resolves any of the substantive claims is irrelevant to the issue of appellate jurisdiction. Accordingly, we conclude that the ICA has jurisdiction over this case pursuant to HRS § 641-1(a).

### B. *The Supreme Court's Order*

■ The City Clerk argues that the Hawai'i Supreme Court's September 3, 2008 order denying Stop Rail's Petition for Writ of Mandamus is "persuasive authority" to deny the ICA Motion. However, the supreme court's order simply stated:

> [W]e conclude that Petitioners have not demonstrated that they are entitled to mandamus relief. *See Kema v. Gaddis*, 91 Hawai'i 200, 204–05, 982 P.2d 334, 338–39 (1999) (A writ of mandamus is an extraordinary remedy that will not issue unless the petitioner demonstrates a clear and indisputable right to relief and a lack of alternative means to adequately address the alleged wrong or obtain the requested action).

Thus, we do not know whether the supreme court's ruling rested on the first part of the *Kema* test (failure to demonstrate right to relief), or the second part of the test (failure to demonstrate lack of alternative means to obtain relief), or both. Accordingly, it is possible that the supreme court denied the petition simply because it found that Stop Rail had an alternative means to obtain relief because Stop Rail could appeal to this court. That clearly would not be a basis for giving the supreme court's order preclusive effect here. Accordingly, we reject the City Clerk's argument.

### C. *The Preliminary Injunction*

#### 1. *The Likelihood that Stop Rail Will Prevail on the Merits*

The merits of Stop Rail's appeal are grounded in the interpretation of Article III, Chapter 4, of the Charter, which provides:

### CHAPTER 4
### ORDINANCES BY INITIATIVE POWER

**Section 3–401. Declaration—**

1. Power. The power of electors to propose and adopt ordinances shall be the initiative power.

2. Limitation. The initiative power shall not extend to any ordinance authorizing or repealing the levy of taxes, the appropriation of money, the issuance of bonds, the salaries of county employees or officers, or any matter governed by collective bargaining contracts.

**Section 3–402. Procedure for Enactment and Adoption—**

1. Petition. An ordinance may be proposed by petition, signed by duly registered voters equal in number to at least ten percent of the total voters registered in the last regular mayoral election.

2. Form of Petition. Each voter signing such petition shall add to the signature, the voter's printed name, residence, social security number and the date of signing.

3. Affidavit on Petition. Signatures may be on separate sheets, but each sheet shall have appended to it the affidavit of some person, not necessarily a signer of the petition, that, to the best of the affiant's knowledge and belief, the persons whose signatures appear on the sheet are

duly registered voters of the city, that they signed with full knowledge of the contents of the petition and that their residences are correctly given.

4. Proposed Ordinance. Such petition shall set forth the proposed ordinance, or a draft of the proposed ordinance may be attached and made a part of such petition.

**Section 3–403. Filing and Examination of Signatures on Petition—**

1. Duty of Clerk. Upon filing of such petition with the council, the clerk shall examine it to see whether it contains a sufficient number of apparently genuine signatures of duly registered voters. The clerk may question the genuineness of any signature or signatures appearing on the petition, and if the clerk finds that any such signature or signatures are not genuine, the clerk shall, after public disclosure of the signatures in question, disregard them in determining whether the petition contains a sufficient number of signatures.

2. Clerk to Reject Petition, When. The clerk shall eliminate any sheet of the petition which is not accompanied by the required affidavit. The invalidity of any sheet shall not affect the validity of the petition if a sufficient number of signatures remains after eliminating such invalid sheet. The clerk shall complete the examination of the petition within twenty working days after the date of filing with the council.

3. Review by the Court. A final determination as to the sufficiency or validity of the petition may be subject to court review.

**Section 3–404. Submission of Proposal to Electors—**

1. For General Elections. Any petition for proposed ordinance which has been filed with the council at least ninety days prior to a general election and which has been certified by the clerk, shall be submitted to electors for the aforementioned general election.

2. For Scheduled Special Elections. If any petition for proposed ordinance is filed at least ninety days before a scheduled special election within the city and which has been certified by the clerk, it shall be submitted to the electors for the aforementioned special election.

3. For Initiative Special Elections. A special election for an ordinance by initiative power shall be called within ninety days of filing of the petition if signed by duly registered voters equal in number to at least fifteen percent of the votes cast for mayor in the last regular mayoral election, and if such petition specifies that a special election be called; provided that if the clerk certifies less than fifteen percent but at least ten percent, the proposed ordinance shall be submitted at the next general election or scheduled special election. No special initiative election shall be held if an election is scheduled within one hundred eighty days of submission of the proposal.

4. Adoption by the Council. If the council introduces and adopts after three separate readings, including a public hearing, the proposed ordinance which was the basis for a petition on or before ten days prior to date of publication of the proposed ordinance as required in this charter, then the proposed ordinance need not be submitted to the electors.

**Section 3–405. Adoption, Effective Date and Limitation—**

1. Adoption and Effective Date of Ordinance. Any proposed ordinance which is approved by the majority of voters voting thereon shall be adopted, and shall become effective ten days after certification of the results of the election, or at the time and under the conditions specified in the ordinance; provided, however, that in the event that two or more proposed ordinances conflict with each other in whole or in part and each is approved by a majority of the voters voting thereon, the proposed ordinance receiving the highest number of votes shall be adopted and shall take effect as aforesaid.

2. No Veto. No ordinance adopted by the initiative power shall be subject to mayoral veto.

3. Limitation Against Council. No ordinance adopted by initiative power shall be amended or repealed by the council

.. 

248

within two years after adoption, except as a result of subsequent initiative or by an ordinance adopted by the affirmative vote of at least three quarters of the entire council after public hearing.

**Section 3–406. Approval of Alteration—**

1. Amendments Made by Corporation Counsel. The petition shall designate and authorize not less than three nor more than five of the signers thereto to approve any alterations in form or language, or any restatement of the text of the proposed ordinance which may be made by the corporation counsel.

2. Restatement of Proposed Ordinance on Ballot. The same designated and authorized signers shall approve any restatement of the proposed ordinance on the ballot.

**Section 3–407. Inconsistent Provisions—**

All rules, ordinances and Revised Charter provisions which are inconsistent with this chapter shall be superseded by the provisions of this chapter from its effective date.

As Stop Rail frames the argument, the one and only issue in this appeal is the meaning of the "provided" clause in the first sentence of § 3–404(3):

3. For Initiative Special Elections. A special election for an ordinance by initiative power shall be called within ninety days of filing of the petition if signed by duly registered voters equal in number to *at least fifteen percent of the votes cast* for mayor in the last regular mayoral election, and if such petition specifies that a special election be called; *provided that if the clerk certifies less than fifteen per-*

*cent but at least ten percent, the proposed ordinance shall be submitted at the next general election* or scheduled special election. No special initiative election shall be held if an election is scheduled within one hundred eighty days of submission of the proposal.

(Emphasis added.)

Stop Rail argues that, under the canon of construction denominated *noscitur a sociis*, the "votes cast standard" laid down in the immediately prior reference is a strong indication that the references to "fifteen percent" and "ten percent" in the "provided" clause should be interpreted to mean "fifteen percent of the votes cast" and "ten percent of the votes cast." [7] Regardless of the exact formulation of the moving party's burden in establishing a likelihood of success on the merits, Stop Rail's argument is sufficiently cogent to establish a prima facie case in support of their position on the merits to require us to weigh the issues of irreparable harm and whether the public's interests would be furthered by the requested relief. *See Life of the Land v. Ariyoshi,* 59 Haw. at 165, 577 P.2d at 1122.

▆▆▆ There are, however, other potentially meritorious interpretations of the relevant Charter provisions. It is well established that the fundamental starting point for statutory construction is the language of the statute itself. *State v. Bayly,* 118 Hawai'i 1, 6, 185 P.3d 186, 191 (2008). Considering § 3–404(3) in the context of the entire chapter providing the initiative power to the electors, which we must do, supports an interpretation contrary to that proposed by Stop Rail. *See, e.g., Office of Hawaiian Affairs,* 117 Hawai'i at 191, 177 P.3d at 901 ("[I]t is a cardinal rule

---

7. Stop Rail also argues that the 1992 Charter Amendments, which changed the standard for counting qualified signatures from "votes cast" to "registered voters" in virtually all other Charter initiative provisions, but not § 3–404(3), supports the conclusion that § 3–404(3) was intentionally left alone. However, as will undoubtedly be addressed more fully by the parties and the court on the merits of Stop Rail's appeal when this appeal proceeds to a full briefing, there are potentially meritorious arguments to the contrary. For example, as discussed below, there is the potentially meritorious argument that, notwithstanding a "lower" standard in § 3–404(3),

all petitions for ordinance by initiative must meet *all* of the requirements in § 3–402 before they are eligible for submission to the electors under *any* of the three alternative election scenarios described in § 3–404. Stop Rail also contends that the title to § 3–404(3), "For Initiative Special Elections," "makes it clear" that there is a special rule for such elections and that the rules that are applicable to petitions for general elections and scheduled special elections do not apply to initiative special elections. Finally, at oral argument, Stop Rail argued that the more specific language of § 3–404(3) should be favored over the general requirements stated in § 3–402.

of statutory construction that courts are bound, if rational and practical, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute."); *Franks v. City and County of Honolulu,* 74 Haw. 328, 335, 843 P.2d 668, 671 (1993) ("We must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.") (citation omitted). Arguably, Stop Rail's interpretation would nullify the equally clear requirements of § 3–402(1), which provides (emphasis added):

> **Section 3–402. Procedure for Enactment and Adoption—**
>
> 1. Petition. An ordinance may be proposed by petition, signed by duly registered voters equal in number to *at least ten percent of the total voters registered* in the last regular mayoral election.

Section 3–402 can be interpreted to set a "threshold" for *all* petitions for ordinances by initiative power, whether the petitioners seek to submit the proposal at a general election, a scheduled special election, or an initiative special election. Stop Rail argues that the "general" requirement of § 3–402(1), requiring signatures of at least ten percent of the *"registered voters,"* should not be applied to the Petition in light of the more "specific" language of § 3–404(3), which seems to require only signatures of at least ten percent of the "votes cast" for a *Special Initiative Election* petition to get on a general election ballot. Stop Rail admits, however, that the language of § 3–402 does not limit itself to *General Election* and/or *Scheduled Special Election* petitions. Indeed, the record indicates that Stop Rail has implicitly acknowledged the applicability of the *other* subsections of § 3–402, which set forth the initial procedures through which an ordinance can be enacted and adopted:

> **Section 3–402. Procedure for Enactment and Adoption—**
>
> 1. Petition. An ordinance may be proposed by petition, signed by duly registered voters equal in number to at least

ten percent of the total voters registered in the last regular mayoral election.

> 2. Form of Petition. Each voter signing such petition shall add to the signature, the voter's printed name, residence, social security number and the date of signing.
>
> 3. Affidavit on Petition. Signatures may be on separate sheets, but each sheet shall have appended to it the affidavit of some person, not necessarily a signer of the petition, that, to the best of the affiant's knowledge and belief, the persons whose signatures appear on the sheet are duly registered voters of the city, that they signed with full knowledge of the contents of the petition and that their residences are correctly given.
>
> 4. Proposed Ordinance. Such petition shall set forth the proposed ordinance, or a draft of the proposed ordinance may be attached and made a part of such petition.

While it was preparing the Petition for filing, Stop Rail made inquiries to the City Clerk regarding how to meet the affidavit requirements of § 3–402(3). Stop Rail did not challenge the City Clerk's disqualification of signatures that did not meet the requirements of § 3–402(2). It appears that Stop Rail only construes § 3–402(1) to be inapplicable to their petition.

This ambiguity, and apparent inconsistency, in the Charter provisions arose out of the 1992 amendments to the Charter. Prior to 1992, § 3–402(1) stated (emphasis added):

> 1. Petition. An ordinance may be proposed by petition, signed by qualified electors equal in number to *at least ten percent of the entire vote cast* for mayor in the last preceding mayoral election.

The change to the language of § 3–402(1) resulted from the November 3, 1992 General Election ballot on Charter amendments, which asked voters to vote yes or no on the following:

CHANGE SIGNATURE REQUIREMENTS FOR RECALL AND INITIATIVE FROM BASE OF "TOTAL VOTES CAST" TO "TOTAL REGISTERED VOTERS"

Neither the Charter Commission Brochure explaining the proposed changes nor the

Charter Commission Report that serves as a sort of "legislative history" for the 1992 proposal gives any indication that this amendment was intended to affect some, but not all, kinds of initiative petitions. Nevertheless, Stop Rail correctly points out that the 1992 Charter amendments included other changes to § 3–404(3), but did not change the "votes cast" standard to a "registered voter" standard. We are not confident, at this point, that either interpretation is substantially likely to prevail on the determination of the merits of this appeal.

Indeed, the City Clerk's initial position, when presented with the Petition, was that petitioners have three distinct options for the election at which a proposed ordinance can be submitted: a general election, a scheduled special election, or an initiative special election. As Stop Rail opted to seek a "special election," the City Clerk considered Stop Rail to be bound by what the City Clerk understood to be a prohibition against seeking a special initiative election within 180 days prior to any scheduled election in Honolulu. The last sentence of § 3–404(3) provides:

> No special initiative election shall be held if an election is scheduled within one hundred eighty days of submission of the proposal.

As the Circuit Court rejected this argument in the Second Amended Order (as well as in the prior orders), neither party to the ICA Motion has developed this argument on the motion. However, it appears that the City Clerk has not abandoned its argument and it may well be considered in the review of the merits of Stop Rail's appeal and the cross-appeal, if any, by the City Clerk.

The bottom line, however, as noted above, is that Stop Rail has made a sufficient showing on the merits to require us to weigh the issues of irreparable harm and the interests of the public in the outcome of the ICA Motion.

2. *The Balancing of Irreparable Harm and the Public Interests*

▆ Stop Rail argues that the balance of irreparable harm favors granting the requested injunctive relief because:

> If the City Clerk does not place the Petition on the November 4, 2008, general election ballot, [Stop Rail] will lose their rights to have the issue *decided this year.* The City Clerk suffers no damage if the preliminary injunction is granted. If the City Clerk were to prevail, the ballots for Petition 53 need not be counted. However, [Stop Rail] cannot have non-existent ballots counted. Finally, the public interest is great and there is *no other remedy* to [Stop Rail] as the circuit court below found[.]

Stop Rail presented no affidavits, declarations, or other sworn statements supporting the assertion of irreparable harm in conjunction with the ICA Motion, as provided in HRAP 8(a), but the Callan Declaration, which was submitted to the Circuit Court, contained the following unchallenged averment:

> The next general election is November 4, 2008. Unless this initiative is placed on the general election ballot, both I and the voters of the City & County of Honolulu will be denied the right to vote on this initiative this year.

Thus, it is undisputed that Stop Rail will suffer the aforementioned harm and, as this appeal will likely be concluded on the merits long after the November 4, 2008 election, this *specific* injury cannot be avoided, except through the relief requested by Stop Rail and, therefore, appears to be irreparable.

The City Clerk argues, in essence, that any harm to Stop Rail and Honolulu voters has been greatly mitigated by the passage of Reso 08–166. The City Clerk posits that, with the passage of Reso 08–166, there *will be* a ballot question on rail transit presented to Honolulu voters, regardless of the outcome of this motion. Callan's Declaration does not address the distinctions between and/or the relative merits of Stop Rail's ballot question versus the Reso 08–166 ballot question. Both questions address the same underlying issue of rail transit, and while we recognize the differences between them, we have little basis for declaring that more harm would result from a vote on one versus the other.

It seems clear, however, that the voting public, including Stop Rail's supporters, would be most irreparably harmed by a decision of this court that would jeopardize the public's right to vote on the fundamental issue underlying both ballot questions, whether the public supports rail transit or not. Thus, we must examine the potential impact of our ruling on the ICA Motion in light of the "provided that" clause in Reso 08–166, which follows (emphasis added):

BE IT RESOLVED by the Council of the City and County of Honolulu:

1. That it propose and it is hereby proposed that the following question be placed on the 2008 general election ballot; *provided that if the ballot question posed in Petition 53 (2008)*, either in its original form or as it may be altered or restated pursuant to RCH Section 3–406, *is included in the ballot language submitted by the city clerk to the chief election officer of the State of Hawaii pursuant to HRS Section 11–119(b), the following question shall not be placed on the ballot;*

"Shall the powers, duties, and functions of the city, through its director of transportation services, include establishment of a steel wheel on steel rail transit system?"

In short, if Stop Rail's question goes on the ballot, the Reso 08–166 question "shall not be placed on the ballot."

There are three main scenarios whereby the ruling on this motion affects the public's right to vote on the issue of rail transit:

(1) If injunctive relief is *denied*, Stop Rail's question will not be placed on the November 4, 2008 ballot, but the Reso 08–166 question will be placed on the ballot. Regardless of the ultimate outcome of this appeal, the voting public's right to vote on the issue of rail transit will be preserved, although not in the form requested by the 35,056 duly registered voters whose signa-

tures on the Petition met the requirements of § 3–403 of the Charter;

(2) If injunctive relief is *granted*, Stop Rail's question presumably will go on the ballot, the Reso 08–166 question presumably will come off the ballot,[8] and if *Stop Rail ultimately prevails* on the merits of this appeal, the ordinance proposed by Stop Rail will go into effect and will prohibit trains and rail transit in Honolulu. The voting public's right to vote on the issue of rail transit will be preserved and the specific injury to Stop Rail would be avoided; or

(3) If injunctive relief is *granted*, but *Stop Rail does not prevail* on the merits of this appeal, Stop Rail's question presumably would appear on the ballot, but the votes on that question would not count. In addition, the Reso 08–166 question would not appear on the ballot. Thus, Honolulu voters would *not* be assured of an opportunity to vote on the issue of rail transit in this year's general election.

In addition, as the City Clerk informed the court, the deadline for submitting general election ballot questions and issues to the State's Chief Election Officer was no later than 4:30 p.m. on the sixtieth calendar day prior to the general election, in this case, September 5, 2008. *See* HRS § 11–119(b). With the Memorandum in Opposition to the ICA Motion, the City Clerk submitted a Declaration supporting various arguments impacting our analysis of the balancing of harms, including the following:

1. Stop Rail erroneously assumes that because portions of the general election ballot cannot be finalized until after the primary election, the Petition could be easily added to the general election ballot. The City Clerk states that, once the State's Chief Elections Officer

---

8. This scenario and the third scenario below are potentially impacted by various open questions related to whether the State's Chief Election Officer, who is not before the court, will be able to substitute the Stop Rail question for the Reso 08–166 question that is now anticipated to appear on the ballot, in a timely manner, as discussed

hereinafter. Even if, as Stop Rail suggested at the hearing on the ICA Motion, the Reso 08–166 question was retained on the ballot, its ultimate validity could be challenged given the clear language of the resolution stating that the question was to be presented to the voters *only if* Stop Rail's question was not.

receives ballot questions from the City Clerk by the deadline set forth in HRS § 11–119(b), the State Elections Office formats the ballots, which must also be translated into Chinese, Japanese, and Ilocano, as required by law. All that is required after the primary election is the insertion of the prevailing candidate names into already formatted ballots;

2. The State Elections Office begins printing general election ballots on September 22, 2008. Ballot printing needs to begin as soon as possible after the primary election so that the printing company can deliver the general election absentee ballots to the counties by September 27, 2008;

3. The immediate printing of ballots will allow the counties to timely send overseas absentee ballots pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. §§ 1973ff–1 to 1973ff–6 ("UOCAVA"). Under UOCAVA, absentee uniformed services voters and overseas voters are permitted to "vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 42 U.S.C. § 1973ff–1. In Hawaii, absentee ballots must be received not later than the close of the polls on any election day. HRS § 15–9 (1993). In order to allow overseas citizens a fair opportunity to vote in the general election by absentee ballot, the City Clerk mails overseas absentee ballots between 30–35 days before the general election. The Federal Voting Assistance Program of the Department of Defense recommends an allowance of 35 days for ballot round trip mailing time for overseas absentee ballots. If a jurisdiction fails to timely mail its absentee ballots at least 30 days prior to the election, the U.S. Justice Department can sue the jurisdiction for failing to meet a reasonable benchmark period and to order the jurisdiction to extend the time for acceptance of returned overseas ballots. The City

Clerk has targeted Tuesday, September 30, 2008, as the mailing date for overseas ballots (35 calendar days before the general election);

4. Should Stop Rail's Petition question be placed on the ballot, additional time, hardship, and unbudgeted costs will be incurred and there is no guarantee that the State Elections Office will be able to accommodate the changes within the requisite time frame. Delay in transmitting overseas ballots could result in an extended deadline for acceptance of returned ballots and delayed tabulation of the results of the general election, including all federal, state, and county elections. Revisions to the Honolulu election ballot will impact not only the production of ballots and the programming of the election system in Honolulu, but also in the counties of Maui, Hawaii, and Kauai, and will have far-reaching operational and logistical impact to the entire State election timetable.

The City Clerk also argues that the possibility of having two rail questions on the general election ballot will likely confuse voters. For example, a voter who opposes rail would have to vote yes on one question and no on the other. The ICA Motion does not request that we order the removal of the Reso 08–166 question, nor does it provide any authority for such action.

This court has no method to precisely gauge the likelihood that granting Stop Rail's motion would in fact cause the delays and consequences attested to by the City Clerk, However, her Declaration is the only evidence before the court on these issues and we cannot simply dismiss the possibility that granting the requested relief could engender unintended, serious, negative consequences for the upcoming general election. We must weigh that potential harm to the public's interests, along with the possibility that granting the ICA Motion could ultimately deprive voters of the right to a valid vote on the rail issue in the upcoming election, against the harm to Stop Rail if voters do not

have an opportunity to vote in the upcoming general election on the form of the question posed in the Petition. Based on all of the arguments and the record before us, we conclude that the potential harm to the public's interests outweigh the injury to Stop Rail and, therefore, the ICA Motion must be denied.[9]

9. While the many Stop Rail supporters and volunteers who worked diligently to present the Petition question to the Honolulu voters did not reach that goal, nevertheless, their efforts had a significant impact. The Honolulu voters will be voting on rail transit on November 4, 2008, both

## IV.  CONCLUSION

For the foregoing reasons, we deny Stop Rail's Motion for Preliminary Injunction filed herein on September 15, 2008.

sides of the issue will have an opportunity to make their best case to the voters, and the voting public's voice will be registered on the issue.